Judgment reversed, and a <em>procedendo</em> awarded.

# Coleman's Appeal.

1. Without a voluntary submission by a defendant in foreign attachment to the jurisdiction of the court, a judgment in such case can be enforced only against the property attached or against the garnishee *in personam* to the extent of the property in his hands.

2. Such judgment has no extra-territorial operation.

3. Foreign attachment will not lie upon a demand in tort.

4. When the claim is for goods or land of a non-resident in his constructive possession by his agent or tenant, the plaintiff has a remedy by replevin or ejectment against the person in possession for the goods or land; or in trover for damages for the goods.

5. In an ordinary demand for debt or damage, the person of a non-resident cannot be reached by process from a court of common law.

6. In Pennsylvania unless there be service within the jurisdiction, there can be no judgment for want of an appearance.

7. As a general principle wherever a court of equity has jurisdiction, it will make a complete decree so as to settle the controversy between all the parties: but although defendant's property be within its reach, this will not give jurisdiction of his person, if a non-resident, so as to authorize service upon him in another state, and to enter a personal decree against him.

8. Under the Act of April 9th 1859, as to execution of process on non-residents, &c.; the bill must be confined, so far as the interest of a foreign defendant is concerned, only to the property in question: process cannot be served on the defendant.

| 75 | 441 |
| d 20 | SC11596 |
| 75 | 441 |
| 26 SC | 1383 |
| 75 | 441 |
| 211 | 11316 |
| 211 | 476 |
| f 211 | 10478 |
| 75 | 441 |
| 214 | 393 |

9. A bill was against a corporation, Dwight, who was alleged to hold stock in the corporation and money arising out of corporation transactions and other defendants alleged to be debtors to Dwight, to compel a transfer of stock and payment of the money to the plaintiff claiming to be entitled to the stock and money held by Dwight. *Held,* that Dwight only was " the principal defendant" under the Act April 6th 1859.

10. Dwight being a resident of another state, process served upon him there could not give jurisdiction of his person.

11. By order of the court Dwight was served in New York, he moved to set aside the order, service, &c. : this being refused he appeared *de bene esse* reserving all exceptions to the order and service, and under rule answered under a similar reservation : *Held,* that this did not estop him for setting up the want of jurisdiction at any stage.

12. If a final decree had been made in the court below, he could make objection to jurisdiction in the Supreme Court.

March 13th 1874. Before AGNEW, C. J., SHARSWOOD, MERCUR and GORDON, JJ. WILLIAMS, J., at Nisi Prius.

Appeal from the decree of the Court of Common Pleas of *Tioga county :* In Equity: No. 19, to January Term 1874.

On the 30th of August 1870, Fletcher Coleman filed a bill in the Court of Common Pleas of Lycoming county, In Equity against Walton Dwight, The Williamsport and Canada Lumber Company, Anna Dwight and Anson G. P. Dodge.

The bill set out :—

1. Plaintiff was a resident of Williamsport, Pennsylvania.

2. The defendant (Dwight) was a resident of the state of New York, but interested as part owner of timber-lands in Pennsylvania.

3, 4, 5. In November 1866, Dwight represented to plaintiff that he could purchase for $300,000 from one Guion, a large body of lands in Canada held by him, and one Bennett, to whom Guion was indebted.

6–9. Averred that Dwight made other representations in relation to the lands, their value, the price at which they could be purchased, &c.

10, 11, 12. Dwight proposed the organization of an association under the mining and manufacturing laws of Pennsylvania, with a capital of $500,000 in shares of $50 each, Dwight and his friends to subscribe for part of the stock, the plaintiff and others at Williamsport to subscribe for the remainder. The plaintiff and others formed the association, and on the 4th of February 1867 obtained letters patent as a corporation, under the name of the " Williamsport and Canada Lumber Company," and the association was organized and officers elected.

13, 14, 15. An agreement was entered into with Dwight for the purchase of the Canada timber-land of which he had the refusal from Guion; the company to pay Dwight $300,000 in cash and $600,000 in the capital stock of the company; the object was to increase the stock of the company to $900,000, and it was agreed that Dwight should immediately transfer to the plaintiff and others

the $600,000 of stock in proportion to the amount of original capital subscribed by them; and Dwight made the transfer.

16. In all the arrangement Dwight acted solely for the plaintiff and others, and not for himself, and the purchase, although in his name, was for the members of the company according to the interests held by them.

17, 18. The sum of $150,000 was paid to Dwight; he went to Canada, and on his return, represented that he had paid the $150,000 to Guion and Bennett in cash, and given his note to Guion, payable June 1st 1867, for $150,000, and secured the property.

19, 20. Relying upon Dwight's statements, the plaintiff and others, on the 1st of May 1867, paid him the further sum of $150,000; and the plaintiff paid in all $12,500, and Dwight demanded and received the sum of $1700 for his services and expenses.

21, 22. The representations of Dwight were false; he had not agreed to pay Guion $300,000; but all that he paid was $50,000 in gold.

23, 24, 25. Dwight subscribed for 830 shares of the stock of the company for himself and friends, and there was standing in his name on the books of the company 2431 shares of the stock which were paid for by money subscribed and paid by the plaintiff and others, and 98 of the shares belong to the plaintiff. The balance of the money paid by the plaintiff and others was still in Dwight's hands, and of that balance $10,416.66 belong to the plaintiff.

26. The company still existed in Williamsport, Lycoming county, where its principal place of business still was.

27, 28, 29. On September 27th 1869, the plaintiff issued a foreign attachment in the Common Pleas of Lycoming county, in which the lumber company was made garnishee and the stock in Dwight's name attached. On the 10th of November plaintiff issued a foreign attachment against Dwight, in which Anson G. P. Dodge was garnishee. The title to the property attached in the hands of Dodge was in the name of Anna Dwight, the wife of the defendant, Dwight, but the property belonged to him, and was placed in his wife's name to hinder and delay the plaintiff and others and to prevent the collection of the claim on this bill.

The prayers were:—

1. That the Lumber Company transfer to the plaintiff 98 shares of the stock standing on their books in the name of Dwight.

2. That Dwight account for and pay to the plaintiff the $10,416.66 in his hands, the property of plaintiff, with interest, &c.

3. That Anson G. P. Dodge and Anna Dwight be made defendants.

4. For general relief.

[Coleman's Appeal.]

On the 30th of September 1870, an affidavit was filed, setting forth that Walton Dwight and Anna Dwight resided in Binghamton, New York, and thereupon the court ordered that a copy of the bill be served on them wherever they may be found in that state, with a copy of the order returnable on the 4th Monday of September then next. On the 1st of September, the sheriff returned that he had served the bill upon Mr. and Mrs. Dwight in the state of New York, &c.

The defendants, October 27th 1870, moved that the service be set aside, because it was not made within the jurisdiction of the court, but within the state of New York, and because the cause of action set forth in the bill was a personal claim against Walton Dwight, and not against him and any of the other defendants, and therefore the residence of any of the defendants in Lycoming county could not give jurisdiction over Dwight or authorize the court to direct the service of the order and bill on him in the state of New York.

On the 28th of March 1871, the motion to vacate the order and strike off the service was refused, Gamble, P. J., delivering the opinion, to wit:—

"* * * The reasons filed and urged in support of these motions are: that the court had no authority to make such order of service in these cases; that the causes of action set out in the plaintiff's bill are personal claims against Walton Dwight alone, &c.; and that the order itself is defective in that it does not fix a day certain for the appearance of the defendants, as required by the Act of Assembly and the rules of court.

"The order of court of the 30th day of August 1870, in these several cases, was made upon the special motion of the plaintiff's counsel for that purpose, under the authority of the Act of Assembly of the 6th of April 1859: Purdon's Digest 403, pl. 19. These suits had been instituted in this court; they were concerning certain stock of the Williamsport and Canada Lumber Company, a corporation whose office and place of business was at Williamsport, within the jurisdiction of this court. The said corporation was made one of the defendants, and the court was asked to make a decree against the said corporation, defendant.

"We think the court had not only jurisdiction of the subject-matter on account of its location, but had acquired jurisdiction by the service of its process upon one or more of the principal defendants within the true intent and meaning of the Act of 1859.

"Such are the cases in which that act authorizes the court to order and direct that any subpœna or subpœnas, or *other process to be had in such suit,* be served upon any defendant or defendants therein then residing, or being out of the jurisdiction of such court, wherever he or she may be found. Our 6th Rule of Equity

[Coleman's Appeal.]

Practice dispenses with subpoenas, and substitutes therefor the service of a printed copy of the bill, with a notice endorsed thereon of the time and place of the required appearance, the precise form of which is given in the rule. By the 11th Rule, the process to be served upon non-resident defendants under the provisions of the Act of the 6th of April 1859, is specified to be a copy of the bill, with endorsement of the time and place for appearance, as the rules require in other cases. The printed copy of the bill thus formally endorsed constitutes the 'other process to be had in the suit' authorized to be served upon non-resident defendants by the Act of 1859.

"It appeared from the affidavits filed in the suits that these non-resident defendants were residing in Binghamton, in the state of New York, accessible to Williamsport, within a few hours' travel by railroad. The court did not deem it necessary, therefore, to extend the time for appearance beyond the fourteen days, after service, specified in the endorsement on the bill, but directed the bill, thus endorsed, to be served upon them. It is a mistake, therefore, to say that the process served fixed no time for the appearance, or that the order of court directing the service of a printed copy of the bill containing an endorsement limiting the time for the appearance, 'within fourteen days after service,' fixed no time for such appearance.

"The proceeding on the part of the plaintiffs in these several cases to obtain service of process upon the non-resident defendants, and the order of court in pursuance thereof, seem to be in conformity with the law and practice in such cases. The motion to vacate the order and strike off the service is therefore refused, and the rule to show cause is discharged."

On the 8th of April 1871, R. P. Allen and H. H. Cummin, Esquires, appeared *de bene esse* for Mr. and Mrs. Dwight, "reserving all exceptions heretofore filed in this case as to the order of service, manner of service, and return of service."

On the 26th of April the court granted a rule on the defendants to demur, answer or plead within thirty days.

On the 2d of June 1871, the defendants Dwight and wife filed separate answers.

Dwight denied that he owned land in Pennsylvania at the time of filing the bill or since.

He averred that in November 1866, he contracted with Guion for the purchase of the Canada timber-lands at defendant's option, on paying $50,000 in gold to Benson Bennett & Co., in Quebec, on the 8th of March 1867, and paying on the same day to Guion the difference in United States currency between the value of $50,000 in gold and $150,000 in United States currency; and also $150,000 in the same currency on the 1st day of June 1867; he returned to Williamsport, and in November or December 1866, met at different

times Fletcher Coleman, the plaintiff, and a number of others, and informed them that he held the optional contract, that he had explored timber-lands in Canada, of which a portion of this property was part; that timber from it could be delivered at Albany cheaper than from Michigan or Pennsylvania forests; he informed them of the terms of his contract with Guion as before set forth, and that unless the $50,000 in gold should be paid to Benson Bennett & Co., on or before the 8th of March 1867, his contract with Guion would be forfeited; that the property was low at $300,000, but he did not request the persons above mentioned, or any of them, to join him in the purchase of the land from Guion. Defendant said to them that he was not able to purchase the land with his own means, and proposed to them to join him in forming a company under the mining and manufacturing laws of Pennsylvania, with an actual cash capital of $300,000, at which sum the company after its organization should buy the lands from him, defendant to own and pay for $50,000 of the cash stock; it was afterwards arranged at the suggestion of one of "the other persons" that the stock should be made $500,000, to be divided into shares of $50 each, and should afterwards be increased to $900,000; when the defendant conveyed to the company the consideration should be $300,000 in money and $600,000 in the full-paid stock of the company, but after the $600,000 of stock should be transferred to defendant, he was to transfer to each promoter, stock in proportion to the amount of his cash subscription without defendant receiving anything for it. In pursuance of these arrangements they organized "The Williamsport and Canada Lumber Company," but no more than $300,000 in cash were paid in.

After it was agreed to form a corporation, defendant, on the 26th of January 1867, made separate agreements with Guion and Bennett for the purchase of the Canada lands, and on the 27th of February the directors passed a resolution to purchase the lands for the company, and on the same day he entered into articles with them for their sale for $300,000; he had not then the "refusal" of the right to purchase, but had previously agreed with Guion for their purchase, and bound himself to pay Bennett & Co. and Guion the sum of $300,000 in the manner before specified; he then returned to Williamsport and informed the corporation what had been done; the plaintiff knew this before he paid anything to the company; the company was to pay defendant the $300,000 cash and $600,000 in stock, as before stated, and he divided the stock amongst them according to the arrangement without receiving anything for it; he never acted as agent in any of the transactions, nor was the purchase for the company; it was made on his own responsibility; nor did plaintiff ever agree to be bound for him to Guion or Bennett & Co. for anything whatever relating to the purchase of the land. After receiving the money from the

Lumber Company, he went to Quebec, and on the 9th of March 1867 he paid Bennett & Co. $50,000 in gold; and on the 18th of March paid the remainder of the $150,000 to Guion, and gave to him defendant's two notes together for $150,000, payable in sixty days; the notes were paid at maturity, and defendant received the deed for the land. He returned to Williamsport, and received from the treasurer of the Lumber Company a certificate for the shares of the stock for which he had subscribed; the balance of the $150,000 was at the same time paid to him by the treasurer; "the plaintiff and others" did not pay him any part of the $150,000, nor did the plaintiff at any time pay him $12,500 or any other sum. The company appointed O. Walker and two others trustees to take the title of the land, and defendant about the 2d of July conveyed the land to them; he averred that neither 98 shares of stock nor any stock standing in his name belonged to the plaintiff, nor had he any money belonging to the plaintiff. He admitted the foreign attachment, &c., and averred that the plaintiff was pursuing him at law for the same cause of action as in this bill; he denied that Dodge was indebted to him, and averred that the indebtedness of Dodge to Mrs. Dwight was *bonâ fide.*

There were other matters in the answer unimportant to note.

Mrs. Dwight by her answer denied knowledge of the allegations of the bill, and also averred that Dodge's indebtedness to her was bonâ fide.

The plaintiffs filed a replication, and B. S. Bentley, Jr., was appointed examiner.

Under the Act of April 28th 1870 (sect. 1, Pamph. L. 1292, 2 Br. Purd. 1164, pl. 2), the defendants (Walton Dwight and wife) removed the cause to the Court of Common Pleas of Tioga county.

After the removal of the record, on the 27th of December 1872, Dwight filed a "supplemental answer," "saving and reserving" all exception, &c., "to the order of service, manner of service and return of service of said bill, and the order compelling my appearance;" and averred that, since filing his answer, the foreign attachments had been removed to the Common Pleas of Tioga county, and on the 13th of February 1872, judgments of nonsuit were duly entered in the same.

On the 31st of December 1872, Walton Dwight and wife entered a plea averring:—

1. That after the removal of the foreign attachments to Tioga county, they were put at issue, and when called for trial, judgments of nonsuit were entered.

2. That at the time of filing the bill Dwight and wife and Dodge resided in the state of New York, had resided there for several years before, and continued to reside there, and that Dodge at the same time was a resident of the state of New York and was still residing there.

25 P. F. Smith—29

[*Coleman's Appeal.*]

3. That the service of the bill was not made on defendants within the jurisdiction of either of the Courts of Common Pleas of Lycoming or Tioga counties, but in the state of New York.

4. That Walton Dwight is the real, actual and only principal defendant named in the bill.

5. That the bill is not concerning goods, lands, &c., or for the perpetuating of testimony concerning any lands, &c, within the jurisdiction of the courts of Lycoming or Tioga counties, or concerning any charge, &c., of encumbrance thereon, "but sets forth a personal claim against the said Walton Dwight alone."

6. That neither the courts of Lycoming nor Tioga counties have jurisdiction by service of process "on one or more of the principal defendants."

The plea prayed judgment whether the defendants should be compelled "to enter into their defence at large," and that the order for special service of the bill be vacated and the service be set aside, and the bill be dismissed as to Walton Dwight and his wife.

A hearing on the defendants' plea to the jurisdiction was had July 29th 1873, when a motion, " reserving exceptions as before," was made that the court vacate and strike off the order of service upon Walton Dwight in the state of New York, * * * and that the service made in pursuance thereof be set aside and he be permitted to withdraw his appearance for the reasons filed, and because nonsuit has been entered in the writs of foreign attachment."

A motion was made also by the plaintiffs that the pleas of Walton Dwight and Anna Dwight be stricken off.

On these motions Williams, P. J., delivered the following opinion :—

" This case was brought in the Common Pleas of Lycoming county in August 1870. In October following a motion was made to set aside the service on Walton and Anna Dwight, for reasons filed. This motion was, after argument, overruled on the 28th of March 1871, and defendants ordered to appear and answer. An appearance was therefore filed, and an answer put in under protest, the defendants expressly "saving and reserving all manner of benefit or advantage of exception to the order of service, manner of service, and return of service of said bill, and the order compelling my appearance thereto." The record was removed to this county in November 1871. In accordance with the provisions of the Act of the 28th of April 1870, the defendants have sought to avail themselves of the reason upon which they moved to set aside the service by pleading to the jurisdiction, and now on the day fixed for hearing upon the plea, they move to vacate the order of service, and to set aside the service thereunder. The plaintiffs also move to strike off the plea, for reasons filed. The plea, the motion to strike off, and the motion to set aside the service of the

bill, &c., were by agreement heard together, and are now for determination. The question for consideration is, has the court rightfully acquired jurisdiction over the defendants, by the service made under its order in the state of New York? This must depend upon the case made by plaintiff's bill, and on the Act of April 6th 1859. That act provides as follows: 'It shall be lawful for any court of this Commonwealth, having equity jurisdiction, upon special motion of the plaintiff in any suit in equity, &c., concerning goods, chattels, lands, tenements or hereditaments, situated or being within the jurisdiction of the court, or when the court has acquired jurisdiction of the subject-matter of the controversy, by the service of its process on one or more of the principal defendants, to order, &c.' It is necessary to inquire, therefore, first, does the plaintiff's bill show this to be a suit in equity, concerning goods, chattels, lands, tenements or hereditaments, situate or being within the jurisdiction of the Court of Common Pleas of Lycoming county? The lands referred to in the bill are in Canada, the goods and chattels are shares of stock in the Williamsport and Canada Lumber Company, which represent the value of the lands. If this suit is concerning goods, &c., within the proper jurisdiction, it is concerning the stock of this company, the office of which is located in Lycoming county. The bill avers that Walton Dwight is a stockholder. We have therefore the question whether the stock of a non-resident shareholder accompanies the person of the owner who holds the certificates, or abides at the office of the corporation.

"If authority was needed upon such a question, it would seem to be at hand in McKean v. The County of Northampton, 13 Wright 519, where it is held that the interest which a stockholder has in the stock of a corporation is *personal*, and is *controlled by the law of his domicil*. Again, it is held in Whitesell v. The County of Northampton, reported in the same volume, at page 526, the shares of stock held by a stockholder resident in Pennsylvania, in corporations *foreign* or *domestic*, are taxable to him personally, &c. Shares are transferred by means of the certificate. The delivery of the certificate, with a power of attorney to transfer, makes a valid title to the shares, even against the corporation itself: Finney's Appeal, 9 P. F. Smith 398; German Association v. Sendmeyer, 14 Wright 67. It follows, then, that the stock of the defendant is transferable by him at the place of his domicil; is properly taxable at the place of his domicil, and, in the language of the Supreme Court, is controlled by the law of his domicil. But if the stock had been within the jurisdiction, is this suit a suit concerning—that is, about, or affecting the stock of the Williamsport and Canada Lumber Company? The defendant sold to the plaintiff, or the company, timber limits in Canada, for $300,000. The bill charges that he paid but $50,000, and that he effected the sale to the corporation by false representa-

tions made to the plaintiffs and others, as to the price paid by him. The *gravamen* of the bill is the fraud of the defendant in his dealings with the plaintiff and the lumber company. The relief sought is the restoration of the money obtained by the fraud. The controversy then affects, is about, or concerning, not the stock of the company that purchased the Canada property and still holds it, but the contract of sale, the representations on which it was founded, and its proceeds in the pockets of the vendor. It seems to us clear that this suit is not concerning goods, chattels, lands, tenements or hereditaments situate or being within the jurisdiction of the court. We are, then, to inquire, in the next place, had the court acquired jurisdiction by the service of its process, on one or more of the defendants? The only other defendants are A. G. P. Dodge and the Williamsport and Canada Lumber Company. No charge of any description is made against Mr. Dodge, nor is it alleged in the argument that he is a principal defendant, but it is alleged that the lumber company is a principal defendant. Webster defines the word 'principal' as meaning chief or head—one who takes the lead; in law, the actor or absolute perpetrator of a crime, or an abettor. A principal defendant, then, is a chief defendant, one charged with doing or aiding another in doing the thing complained of; one who is assailed in hostility, to whom something is sought to be established or recovered. Is the Williamsport and Canada Lumber Company such a defendant? The thing complained of, as we have seen, is fraud and misrepresentation as to the price paid for the Canada property. The person charged with this fraud is Walton Dwight. The company is not charged with aiding or abetting Dwight in any manner, nor with any complicity in or knowledge of the fraud. On the contrary, it does appear affirmatively that in the bill the company was the receptacle of the title to that property, and issued its own stock to the amount of $600,000, in addition to the cost paid in payment therefor. It was the passive, and, as is alleged, the defrauded victim, and not the fraudulent wrongdoer. It was the corporate representative and agent of the plaintiff in the whole transaction. It did not co-operate with the defendant in effecting the sale. It did not share in any profits made out of the sale. But it is said a decree is sought against the Williamsport and Canada Lumber Company, and that it is, therefore, a necessary and a principal party. There is a prayer for a decree requiring the company to transfer certain shares of stock, now standing in the name of defendant, to the plaintiff. The land was sold to the plaintiff and others for $300,000. The corporation was raised to hold the title. It was afterwards decided to raise the stock to $900,000. Of this $300,000 were issued to those who subscribed to the cash capital. The remaining $600,000 were issued to Dwight, and by him assigned to the several stockholders, in proportion to the original sums subscribed by them. This divi-

sion was made, leaving standing in Dwight's name so many shares only, as under this arrangement made his equal proportion. What stock he still holds, therefore, represents cash actually paid in, if he dealt honestly with the plaintiff in selling at $300,000. If he did not deal honestly with him, but sold, by means of fraudulent representations, at a price largely in advance of what he paid, then this stock may represent part of the profits made out of the fraudulent sale. Assuming this to be so, it furnishes no ground for the relief asked against the corporation, but the corporation would be at most but a mere stakeholder, having no possible interest in the question, as to whether the plaintiff or Dwight should hold certain shares of its stock. Dwight, and not the corporation, is to be affected by such a decree, if it could be made. It seems to us therefore clear that this court has no rightful jurisdiction upon either ground, and that the service should be set aside. We are reminded that the question has been already determined in this case against the defendants. We know nothing of the manner in which the question was then presented, except as it is shown by the record, and we have great respect for the learning and ability of the judge who then ruled this question. But we believe it is better for the court before which this cause may yet be tried, and better for the plaintiff, that this question be settled at the earliest moment by the court of last resort. If the service be held good, a determination on the merits can be easily reached. If it be held bad, the plaintiff will be able to reach the proper powers none too soon. The discharge of what seems to us a plain official duty, is rendered more easy by the consideration that the time and interest of both parties is that the question raised by the renewal of the motion to vacate the order of service, &c., be settled promptly and finally."

The following decree was made:—

" And now, July 29th 1873, decree filed that the order on the 30th day of August 1870, authorizing service to be made on Walton Dwight and Anna Dwight, in the state of New York, be vacated and the service made in pursuance of said order be set aside, and the order made on the 26th day of April 1871, on said defendants, to demur, answer or plead, be vacated, and said defendants be permitted to withdraw their appearance, &c."

The plaintiff appealed to the Supreme Court, and assigned these errors:—

1. The court erred in entertaining the motion of Walton Dwight and Anna Dwight, to vacate the order of service made August 30th 1870.

2. The court erred in refusing to strike off the plea filed by Walton Dwight and Anna Dwight.

3. The court erred in assuming jurisdiction of the case in pur-

[Coleman's Appeal.]

suance of the proceedings to remove the same from the Common Pleas of Lycoming county.

4. The court erred in decreeing that the order of the 30th of July 1870, authorizing service to be made on Walton Dwight and Anna Dwight, in the state of New York, be vacated, and the service made in pursuance thereof be set aside, and the order made on the 26th of April 1871, on said defendants to demur, answer or plead, be vacated, and said defendants be permitted to withdraw their appearance.

The Act of April 6th 1859, sect. 1, Pamph. L. 387, 1 Br. Purd. 598, pl. 51, makes it lawful " for any court in this Commonwealth having equity jurisdiction, upon special motion of the plaintiff or plaintiffs, in any suit which has been or shall be instituted therein, concerning goods, chattels, lands, tenements or hereditaments, or for the perpetuating of testimony concerning any lands, tenements, &c., situate or being within the jurisdiction of such court, or concerning any charge, lien, judgment, mortgage, or encumbrance thereon, or where the court have acquired jurisdiction of the subject-matter in controversy by the service of its process on one or more of the principal defendants, to order and direct that any subpœna, subpœnas, or other process to be had in such suit, be served upon any defendant or defendants therein then residing or being out of the jurisdiction of such court, wherever he, she or they may be found, and upon affidavit of such service had, to proceed as fully and effectually as if the same had been made within the jurisdiction of such court. *Provided*, that it shall appear to such court by affidavit, affidavits, or other documents applicable for the purpose, before making such order, in what place or county such defendants reside, or are or probably may be found, and if such place be without the United States, whether there are any officers of the United States residing thereat or near thereto, and by what means such service may be authenticated; and *provided*, that such order limit a time, depending on the place where such process is to be served, after the service thereof within which compliance with the requirements thereof must be made by such defendant or defendants, such process to be returnable at such time after the service thereof as such court shall by special order direct; and *further provided*, that when any such process shall be served, such defendant or defendants shall be also served with a copy of the order authorizing the service thereof and a copy of the bill or petition, if such process be a subpœna thereon, but if not, a statement of the substance and object of the proceeding whereon the same is founded. *Provided also*, that the affidavit of such service of process and copies or statements aforesaid, if such service be made within the United States, may be made and taken before any officer of the United States, or of any of the states and territories thereof, authorized to administer an oath, and if

[Coleman's Appeal.]

such service be had without the United States, the same shall be authenticated as such court shall by special order direct."

*W. H. Armstrong* and *S. Linn,* for appellant.—The Tioga county court did not acquire jurisdiction of the case by the removal. The Act of 1870 is not confined to a case where the parties are single individuals, but where there may be several parties on both sides. Under the Act of Congress of March 2d 1867 (2 Br. U. S. Digest 116), the decisions under that statute, all the defendants must be citizens of the state in which the suit is brought: Bixby *v.* Crouse, 8 McLean 73; Hubbard *v.* Northern Railroad, 3 Blatchford C. C. 84; Beardsley *v.* Torrey, 4 W. C. C. Rep. 286; In Re Turner, 3 Wall. Jr. C. C. R.; Wilson *v.* Blodget, 4 McLean 363; Ex parte Girard, 3 Wall. Jr. 263; Case *v.* Douglass, 1 Dill 299. The court of Tioga county acquired no jurisdiction by the removal, for under the Act of 1870 the court of Lycoming county had no discretion to withhold it. After, on their own application, removing the cause to Tioga county, the defendants could not allege that they were not in court, and move to set aside the service on them. Nor could they, after answering the allegations of the bill and denying the right of the plaintiff, deny the jurisdiction of the court. The Tioga county court vacated the order, &c., because the suit was not concerning goods, lands, &c., within the jurisdiction of the Lycoming county court. Personal property may be in a jurisdiction different from the owner's domicil, and stock of a corporation is liable to foreign attachment: Lex *v.* Potters, 4 Harris 295; equity for the protection of the principal will follow personal property wrongfully taken by an agent, wherever it can be identified: Pierce *v.* McKeehan, 3 W. & S. 280.

*R. P. Allen* and *J. W. Comly* (with whom was *H. H. Cummin*), for appellees.—Until the plaintiff obtains a decree he has nothing to do with the property of the defendant; and a court of Chancery will not interfere by injunction or otherwise to control the defendant in the disposition of his property: Wiggins *v.* Armstrong, 2 Johnson's Ch. 144. This is a personal suit against Walton Dwight alone, and against his property alone, and not against the person or property of either of the other defendants, and comes clearly within the plain words of the Act of Assembly of the 28th of April 1870.

The defendants' removal of the case from Lycoming to Tioga could not estop them, because their appearance to the suit was involuntary. An objection to jurisdiction may be made at the hearing, or on appeal: Baker *v.* Biddle, 1 Bald. 416.

Appearance is the process by which a person against whom a suit has been commenced submits himself to the jurisdiction of the

court; and he will not be permitted to take any steps in the cause until an appearance has been entered on his behalf; even if he desires to object to the regularity of the proceeding by which the plaintiff has sought to compel an appearance, he should first enter a conditional appearance: 1 Daniel Ch. Prac. 453, 536; 2 Id. (Ed. 1846) 4; Price *v.* Webb, 2 Hare 511–512; Foley *v.* Maillardet, 1 De Gex, Jones & Smith 389; Maclean *v.* Dawson, 4 De Gex & Jones 150–152. An appearance *de bene esse* saves being defaulted on an irregular or informal process: Blair *v.* Weaver, 11 S. & R. 84; Winrow *v.* Raymond, 4 Barr 501; Bolard *v.* Mason, 16 P. F. Smith 138.

The bill was not concerning any goods, &c., being in the county of Lycoming, but a personal claim for money against Walton Dwight; plaintiff could not now allege that the stock was not the property of Dwight; the certificate of stock was in Dwight's name, and he could have transferred it in New York by delivering the certificate and a power of attorney to transfer: Finney's Appeal, 9 P. F. Smith 398; German Union Building Association *v.* Sendmeyer, 14 Wright 67; Kortwright *v.* Buffalo Commercial Bank, 20 Wend. 90; Whitesell *v.* Northampton County, 13 Wright 526; McKeen *v.* Northampton County, Id. 519. Shares in corporation stock are personal property: Schonler's Pers. Prop. 620; Rex *v.* Caper, 5 Price 217; Arnold *v.* Ruggles, 1 R. I. 165; Allen *v.* Pegram, 16 Iowa 163; Sewell *v.* Boston Water Power Co., 4 Allen 282; Angell & Ames 560; Mechanics' Bank *v.* New York R. R. Co., 3 Kernan 599; Union Bank of Tennessee *v.* State, 9 Yerger 490; Wildman *v.* Wildman, 9 Vesey 171. Shares in a corporation are not, strictly speaking, chattels, but are rather choses in action: Harris *v.* Stevens, 7 N. H. 454; Sargent *v.* Essex Mar. Railway Co., 9 Pick. 202; Sargent *v.* Franklin Ins. Co., 8 Id. 90; U. S. *v.* Vaughn, 3 Binn. 394; Denton *v.* Livingston, 9 Johns. R. 96. Transfers of stock in a corporation which have not been entered on the books of the company, are nevertheless valid as against all the world except subsequent purchasers in good faith without notice: Parrott *v.* Byers, 40 Cal. 614; McNiel *v.* Tenth Natl. Bank, 46 N. Y. 325; Leitch *v.* Wells, 48 N. Y. 585. The subject-matter not being within the jurisdiction of the court, and there having been no service of the process of the court upon a principal defendant within its jurisdiction, the service of the bill upon Walton Dwight and Anna Dwight in the state of New York cannot be sustained: Eby's Appeal, 20 P. F. Smith 311.

The opinion of the court was delivered, May 11th 1874, by

SHARSWOOD, J.—The first and most important question to be determined upon this appeal is, whether the Court of Common Pleas of Lycoming county, under the bill filed, acquired jurisdiction by the service of process on the defendant Dwight, in the

[Coleman's Appeal.]

state of New York. That depends upon the construction which ought to be given to the Act of Assembly, approved April 6th 1859, Pamph. L. 387, entitled, "An Act to authorize execution of process in certain cases in equity, concerning property within the jurisdiction of the court, and on defendants not resident or found therein."

As the first canon of construction requires us to consider the old law, the mischief and the remedy, it will throw light upon this subject to state briefly the remedies available to a party in this state at the time of the passage of the act in question, against persons "not resident or found therein."

By the Act of 1705, 1 Smith 45—re-enacted and amended by the revised Act of June 13th 1836, Pamph. L. 580—if a non-resident has property, real or personal, within the jurisdiction, an action may be commenced against him by a writ of foreign attachment, commanding the sheriff to attach the defendant, by all and singular his goods and chattels, lands and tenements, in whose hands or possession soever the same may be, so that he be and appear, &c. And in every such writ there must be contained a clause, commanding him to summon all persons, in whose hands or possession the said goods or chattels, or any of them may be, so that they appear, &c. The property itself, if susceptible of manual seizure, is taken possession of by the sheriff, and if not, the summons of the garnishee fixes upon him a liability to the plaintiff, for whatever he may hold belonging or owing to the defendant at that time. Time is allowed to the third term, before judgment can be entered against the defendant for want of appearance, and afterwards a scire facias must be issued against the garnishee, in which he is allowed to controvert under the plea of nulla bona the fact of his indebtedness to the original defendant, or that the property attached was his. The non-resident defendant may have the attachment dissolved by entering security for the plaintiff's claim, or without such dissolution, he may appear voluntarily and take defence against the demand. By such appearance, the proceeding against him may end in a judgment, which will bind him personally, and which may be executed upon any property belonging to him within the reach of the process of the court; and which may follow and be enforced against him extra-territorially. But without such voluntary submission to the jurisdiction of the court, the judgment in the proceeding by foreign attachment can be enforced only against the property attached, or against the garnishee *in personam* to the extent of the property admitted, or found by the verdict of a jury to be in his hands. It is allowed to have no extra-territorial operation. Foreign attachment, however, will not lie upon a demand founded in tort, as was determined in Porter *v.* Hildebrand, 2 Harris 129, and the remarks of Justice Bell in that case deserve to be here noted. "As a peculiar remedy for en-

forcing payment of debts and other pecuniary obligations, assumed by our neighbors, or aliens, it has been found useful, though certainly not unattended with inconvenience; but I have heard no sufficient reason suggested for hazarding the doubtful experiment of conceding the extended efficacy, now, for the first time claimed for it. If such reasons exist they should be more properly addressed to the legislature, where alone resides the power of extending the sphere of its action by specifically declaring the additional causes of complaint to which it should be applicable." It was further held in that case, that the process could not be used in an action to recover from common carriers damages for the loss of a trunk, where the declaration was in tort and not in contract.

Where the claim of the plaintiff is for goods or land in the constructive possession of a non-resident, by his agents or tenants, he has his remedy by a writ of ejectment for the land, making the tenants or occupants defendants, and by a writ of replevin for goods, in like manner summoning the person in possession as defendant; or an action of trover and conversion may be maintained against such person, to recover the value of the goods in damages, where he has refused on demand to give them up, claims the title to be in himself, or there is other evidence of conversion. Where the demand of the plaintiff is founded upon a record, as a judgment or recognisance, or upon a *quasi* record, as a mortgage or mechanic's claim, for which process of scire facias has been provided, the rule of law is that two returns of nihil habet by the sheriff are equivalent to a service, and judgment may be entered against the defendant for want of appearance, but the execution on the judgment is generally limited to the property bound by the original record. In the case of an ordinary demand for debt or damage, there is no mode of reaching by any process issuing from a court of common law, the person of a non-resident defendant not found within the jurisdiction. The process of outlawry in England, originally confined in civil proceedings to actions of trespass *vi et armis*, but afterwards extended by statute to all cases in which a capias could issue, was aimed only at absconding defendants to compel an appearance; for the absence of the defendant beyond the sea at the time the exigent is promulgated, is, at common law, ground to reverse the outlawry, though if the defendant went abroad purposely for delay, that fact may be effectually replied: 3 Blackst. Com. 284, note; Havelock *v.* Geddess, 12 East 631. In Pennsylvania there never has been any process of outlawry in civil cases: Dillman *v.* Schultz, 5 S. & R. 36. Upon a summons, unless there is service within the jurisdiction, there can be no judgment for want of appearance against the defendant.

The rules upon this subject in courts of equity, are very succinctly, and, for our purposes, sufficiently stated in Adams on Eq. 322. "In cases where persons interested are out of the jurisdic-

tion of the court, it is sufficient to state that fact in the bill, and
to pray that process may issue on their return; and if the state-
ment be substantiated by proof at the hearing, their appearance in
the suit will be dispensed with.  The power of the court to pro-
ceed to a decree in their absence will depend on the nature of their
interest, and the mode in which it will be affected by the decree.
If they are only passive objects of the judgment of the court, or
their rights are incidental to those of parties before the court, a
complete determination may be obtained.  But, if they are to be
active in performing the decree, or if they have rights wholly dis-
tinct from those of the other parties, the court, in their absence,
cannot proceed to a determination against them."

It will be seen from this brief review that it has not been the
policy of our jurisprudence to bring non-residents within the juris-
diction of our courts unless in very special cases.  In proceeding
against them for torts, even property belonging to them cannot be
reached by process, and in cases of contract nothing but the prop-
erty can be affected unless the defendant voluntarily appear and
submit to the jurisdiction.  We may congratulate ourselves that
such has been the policy, for nothing can be more unjust than to
drag a man thousands of miles, perhaps from a distant state, and
in effect compel him to appear and defend under the penalty of a
judgment or decree against him *pro confesso*.

The Act of 1859 ought, therefore, to receive a construction in
harmony with this policy.  There exists no good reason why courts
of equity should be invested with a more enlarged jurisdiction
against non-residents than courts of law.  On the contrary, as
trial by jury is a constitutional right guarantied as well to strangers
as to our own citizens, the inclination should be in a different
direction.  Though it be an undoubted principle, that wherever a
court of equity has jurisdiction, it will go on to make a complete
decree so as to settle the entire controversy between all the parties,
it would be an extreme consequence from that principle to hold, as
we are asked to do in this case, that any subject of property
within its reach will give it jurisdiction of the person of a non-
resident defendant so as to authorize a service of process upon
him, in any other state or country, and to enter a personal decree
against him, if he does not appear for the payment of money.
Such must be practically the consequences, if the contention of
the appellant is supported, and the order of the Court of Common
Pleas of Lycoming county held sufficient to bring the defendant
into court to answer the appellant's bill.  A defendant living in a
remote state or foreign country, charged by a bill in equity with a
fraud, the damages for which are estimated and claimed to be
thousands of dollars, becomes subject to the jurisdiction of this,
to him, foreign tribunal, not, let it be remarked, by voluntary ap-
pearance in a case where there has been no service, but by service

[Coleman's Appeal.]

of process upon him, if fifty dollars of the fruits of the alleged fraud can be followed and ear-marked in a share of stock, a horse or any goods or chattel. A construction which leads logically to such a result cannot be sound, and would require that the legislature should have used language making their intention unquestionable. It would be to impute to the legislature a disregard of the most important principle of all municipal law of Anglo-Saxon origin, that a man shall only be liable to be called on to answer for civil wrongs in the forum of his home, and the tribunal of his vicinage, though his property may be subject to the jurisdiction of the courts of the country where it may happen to be.

If we examine the language of the Act of 1859, we must remark that it is strictly and carefully confined to two classes of cases. First, where a suit in equity has been or shall be instituted, concerning goods, chattels, lands, tenements or hereditaments, or for the perpetuating of testimony concerning any lands, tenements and so forth, situate or being within the jurisdiction of the court, or concerning any charge, lien, judgment, mortgage or encumbrance thereon. And second, where the court have acquired jurisdiction of the subject-matter in controversy, by the service of its process on one or more of the principal defendants.

As to the cases comprehended in the first class, we are of opinion that the bill must be confined, at least so far as the interest of the foreign defendant is involved, to a prayer for a decree affecting only the property in question. If it goes further and asks for relief by a decree against the defendant, personally, though it would be entirely competent for the court to make such decree, if the person of the defendant was within their jurisdiction, it is not a case within the purview of the act, and the court has no authority to direct the service of process upon the defendant. Had the bill in this case been confined to the prayer for relief as to the ninety-eight shares of the capital stock of the Williamsport and Canada Lumber Company, standing upon their books in the name of the defendant Walton Dwight, there would be plausible ground upon which to sustain the service of the process upon him. It may be that shares of stock in an incorporated company within the jurisdiction are within the comprehensive terms "goods and chattels." It is worthy of remark that the English Statutes of 2 Wm. IV., c. 34, and 5 Wm. IV., c. 82, providing for the service of process upon defendants abroad, applied to such suits only as had reference to hereditaments in England, Wales or Ireland, or to encumbrances thereon, or to stock or shares, or the dividends thereof: Adams on Equity 327. It is unnecessary, in the view we have taken, to express any opinion upon this question.

As to the second class, there is certainly some uncertainty, in knowing what the legislature meant by a principal defendant. The contention here has been that the Williamsport and Canada Lumber

[Coleman's Appeal.]

Company are principal defendants. After the best consideration we have been able to give to this question, we have come to the conclusion that by "principal defendants," the legislature meant what in the chancery books are more familiarly and commonly known as "active," as distinguished from mere "passive" parties. Mr. Justice Washington explains this distinction in his usual clear and satisfactory manner in his opinion in Joy *v.* Wirtz, 1 Wash. C. C. Rep. 518. "In deciding who ought to be parties, it is necessary to distinguish between active and passive parties; between those who are so necessarily involved in the subject in controversy and the relief sought for, that no decree can be made without their being before the court; and such as are formal or so far passive, that complete relief can be afforded to those who seek it, without affecting the rights of those who are omitted. The case of Fell and Brown, 2 Brown's Chanc. Rep. 276, presents us with the rule and with a strong illustration of it. A second mortgagee brought a bill against the first, to redeem, without making the heir of the mortgagor a party, who was stated to be resident in another country. An objection for want of parties being made, the Chancellor (Lord Thurlow) observed that there was a distinction as to proceeding in the absence of parties abroad, between their being active and passive; that the mortgagor or his heir cannot be considered as a passive party, because the decree is that the second mortgagee shall redeem the first, and the mortgagor redeem him or stand foreclosed on this account; the mortgagor or his heir being an active party, the court cannot proceed without him, and his being a party cannot be dispensed with, though he is not amenable to the process of the court. Many other cases might be mentioned equally strong with that just cited; and in all of them the rule is so stubborn, that I doubt, if, under any circumstances, it can be made to bend to the plea of necessity. But if a decree can be made without affecting the rights of a person not made a party, or without his having anything to perform necessary to the perfection of the decree, reason as well as adjudged cases will warrant the court in proceeding without him, if he be not amenable to the process of the court or no beneficial purpose is to be effected by making him a party." Now upon an examination of the bill in this case, it is very apparent that Walton Dwight is the only active party against whom relief can be prayed. The others are passive merely. It is true that the bill prays that the Williamsport and Canada Lumber Company shall transfer to the plaintiff ninety-eight shares of the capital stock thereof, now standing upon their books in the name of Walton Dwight. But the bill shows no title or interest of the company in the stock upon which a transfer by them could operate. The legal title of the stock being in Walton Dwight, he alone could transfer it; the equitable title the plaintiff alleges to be in him. The corporation

[Coleman's Appeal.]

are merely the custodians charged with the duty of seeing that no improper transfer be made.    The only decree which the plaintiff could properly ask against the company, would be to enjoin them from permitting Walton Dwight to transfer it, and allowing the plaintiff to do so.    The court might as well order that its own prothonotary should transfer the stock to the plaintiff under the seal of the court, as the company.    The Williamsport and Canada Lumber Company then are not principal defendants.    No decree whatever is asked against Anson G. P. Dodge, except that he be made a party, and it cannot be seriously pretended that he is a principal defendant within the intention of the act.

The other questions in the cause may be very briefly disposed of.    Walton Dwight having been served with process according to the order of the court, moved the court to vacate and strike off the order of service, and to set aside the service made upon him in pursuance thereof.    This motion was refused by the court in Lycoming county.    He then appeared *de bene esse*, reserving all exceptions to the order and service.    When compelled by rule to answer, he did so, under the same special exception.    It is clear that he could not appeal from the interlocutory order of the court, refusing his first motion, and it is equally clear that any and every step which he might afterwards take for his own benefit or security in the course of the proceedings cannot estop or preclude him from setting up the want of jurisdiction at any stage.    It was an objection which lay at the foundation of the whole case, and if it had gone on to a final decree either in Lycoming or Tioga county, the same question would have been open upon an appeal to this court.    Upon the frame of the bill, it is plain that the court could make no decree affecting the right of Walton Dwight either to the shares of stock, or of Mrs. Anna Dwight in the property held by Anson G. P. Dodge, without these defendants, Mr. and Mrs. Dwight, being legally brought into court and made parties to the suit, which, as we have seen, they have not been.    It is unnecessary, therefore, to decide the question whether the cause was legally transferred from Lycoming to Tioga county.    Neither court had any jurisdiction, and the order of the court of Tioga county was therefore right.

Decree affirmed, and appeal dismissed at the costs of the appellant.