WAGNER et al. *v.* HALLACK et al.

1. Debtors residing without this State are excluded *ex vi termini* from the operation of the statute (R. S., p. 418, § 103) which provides that " suits shall be commenced before justices in the township in which the debtor resides." Such non-resident debtors may be sued wherever found.

2. All promises to answer for the debt or default of a third person must be in writing, whether the promise be made before, at the time or after the debt or liability is created.

3. In the absence of words or circumstances showing a contrary intent, the words " we will see the articles paid for;" or equivalent words, import a collateral undertaking and are within the statute of frauds.

4. When the court can clearly ascertain from the evidence what the words were, the determination of their meaning is a question for the court. But where the law assigns to the words a *prima facie* meaning only, and there is some evidence of their having been used in a different sense, their determination is a question for the jury.

5. The initials C. O. D. have a well-known commercial meaning, and manifest the intention of the vendor to control the *jus disponendi*.

*Error to Probate Court of Arapahoe County.*

DURING the month of September, 1872, one Boughten, of Cheyenne, Wyoming Territory, wrote on behalf of one Heenan to the Hallack Brothers, the defendants in error, at Denver, Colorado Territory, requesting them to send to Laramie, Wyoming, certain articles of their manufacture to be used in the erection of a building at Laramie, which Heenan was then under contract to build for the Wagner Brothers, the plaintiffs in error. The articles ordered were prepared and shipped, and as alleged by the Hallacks were received and used by the Wagners. The latter declining to pay for the goods, Hallack Brothers instituted suit against them before a justice of the peace in Denver. The Wagners were non-residents, living in St. Louis, Missouri, but being found in Denver, personal service was had. Upon the trial of the cause before the justice of the peace, the Hallack Brothers recovered judgment, whereupon an appeal was prosecuted to the probate court of Arapahoe county.

Upon the trial in the probate court Erastus F. Hallack, one of the defendants in error, testified: "The date of Boughten's order was the latter part of September, 1872; we shipped the goods by freight and marked them C. O. D.; it is not customary for railroad companies to deliver goods so marked without being paid for them; I don't know that I ever knew it to happen except in this case; I think the bill attached to the deposition of Henry Wagner is the one I sent to Woodbury, but I don't know; my recollection is that I instructed Woodbury to collect this bill made out

against Heenan, from the defendants; I sent this bill to Woodbury, made out against Heenan, to collect of the defendants for goods already sent by freight, C. O. D. C. O. D. means to collect on delivery, by the man or person authorized to collect; Woodbury was authorized to collect; although this bill was sent to Woodbury for the defendants, the bill was made against Heenan because the order came from him; it came through the hands of Boughten for Heenan; I think the goods were charged on our books in the way the bill was made out; the goods were never charged on our books to anybody but Heenan; at the time I received the order I knew for whom Heenan wanted the goods, from the letter received from Boughten, who said that they were for the store of Wagner, for Wagner Bros.; I don't know who received the goods at the place of delivery; these goods were not sent to the defendants; I do not think we wrote any letters to Heenan about paying for these goods; we never gave Heenan credit for the goods nor looked to him for our pay; Boughten was our agent at the time; Woodbury was made our agent in the collection of this bill; I do not know whether or not the defendants ever received those goods; I don't know that a bill for the railroad company accompanied these goods; we sometimes mark goods C. O. D. when we don't expect the railroad company to collect the bill; I marked these goods; I think there were five or sick packages, all marked to Woodbury."

The witness, Woodbury, testified: "I remember a conversation with the defendants sometime in the fall of 1872 in reference to a sale of the stuff for their building; I think it was about the 12th or 15th of October; Henry Wagner requested me to write to the plaintiffs and ask them to ship them some sash, doors and brackets, which had been previously ordered for the building which Heenan was then erecting at Laramie City; to the best of my recollection he requested me to write to the plaintiffs and ask them to send doors, sash, brackets and mouldings which had been ordered for their building, and they would see those articles

paid for ; about that time there was something said that they were afraid the plaintiffs would not ship to them on Heenan's account ; I think this was said by Henry Wagner, and I wrote to the plaintiffs on the same evening ; I only wrote them one letter ; I told them that Wagner Brothers requested them to ship these doors, sash, etc., as soon as they could, or immediately, and they would see them paid for ; I heard from the plaintiffs in answer to that letter ; the bill now shown me attached to the deposition I think I have seen before, either this or a copy of it ; I received it from the plaintiffs in a letter I should think about the 24th or 25th of October, 1874 ; I saw the stuff which the defendants shipped me at Laramie City in the storeroom of the defendants ; part of it was in packages and part of it had been taken apart ; those in packages were marked " B. Woodbury, Laramie City," if I recollect right ; it was noon when I saw them ; I passed by on my way to dinner ; Charles Wagner and Heenan were there at the time ; I had a conversation with them in reference to the goods when I passed ; I think Charles Wagner requested me to stop in ; Heenan and Wagner were in the building at the time ; two doors and one sash had been separated, and they were talking about the size of the sash ; claimed that they were not made according to order ; that these two particular sash were too small — too short and too narrow ; I remarked that I thought they were made according to order, and it could be ascertained by sending for the plan and order ; and I sent to the plaintiffs for them, and received them and measured the sash in question, and found them according to order ; the same evening I had a conversation with the defendants about pay ; I took the bill of the goods to the defendants to their store adjoining the building which was then being erected, and requested them to pay for them ; in answer to my request to pay, the defendants said they did not know whether or not the goods were made according to order, and they were not willing to pay for them until they saw who was to blame, etc. I never understood from the defendants how the goods came to be taken from the depot.

I don't know who took them; I have no recollection of authorizing any one to take them. I next saw those goods in the building of the defendants, put in position in the front; they never paid me for that bill."

There was evidence to prove the value of the goods in question in the Denver market.

On the request of the plaintiffs, the following instructions were given, which were objected to by the defendants:

"1. If the jury find from the evidence that the plaintiffs forwarded the goods to Laramie City to Benjamin Woodbury, as their agent, and if they further find that the defendants took the goods without authority from the plaintiffs or said Woodbury, and converted them to their own use, they are responsible to the plaintiffs for the value thereof."

"2. The jury are instructed that if they find from the evidence that the plaintiffs furnished the material in question to the defendants, and upon the promise of the defendants that they would see them paid for, they will find for the plaintiffs."

"3. When a person furnishes goods to another on a promise to pay for them, made previously to the furnishing of the same by and on the credit of a third person, such third person is liable, and the case is not within the statute of frauds."

The court *ex mero motu* charged the jury as follows, to which the defendants also objected.

"The primary question for you to determine, after finding the sale and delivery of goods, is this: upon what promise and whose credit were the goods sold and delivered? If upon the promise and credit of these defendants, then you should find against them; but if upon the promise and credit of any one else, then you should find in favor of these defendants. In ascertaining this question, you may consider against whom the bill for them was made, whether or not the plaintiffs held the said Heenan primarily liable, so that the value of the material was an existing debt against him at the time the goods were shipped; whether or not

the defendants were only secondarily liable by reason of a promise by them to pay an indebtedness already existing against said Heenan. Should you find from the evidence that the plaintiffs received an order from said Heenan for the goods in question, but declined to ship them to him, or part with the possession of them until they received a promise from the defendants that they would pay for them, if they did so promise, and that in response to and relying upon such promise the plaintiffs shipped said goods to Mr. Woodbury, after which the defendants received them, or the benefit of them, you should find for the plaintiffs."

The jury found a verdict in favor of the plaintiffs, and judgment having been rendered on the verdict, the cause was brought into this court upon writ of error.

Mr. CHARLES S. THOMAS, for plaintiff in error.

Mr. E. P. JACOBSON, for defendant in error.

ELBERT, J. The first question that presents itself in this case is one of jurisdiction.

The plaintiffs in error, who were defendants below, claim that at the time the suit was commenced they were non-residents, and that the cause of action accrued in the Territory of Wyoming. By reason of these facts, it is claimed that the justice of the peace, before whom the suit was originally brought, had no jurisdiction. This claim is based on the language of section 103 of the Justices Act, R..S. 418, which is to the effect, that suits shall be commenced before justices, in the township where the debtor resides, unless the cause of action accrued in the township of the plaintiff. The jurisdiction of justices of the peace in civil actions is statutory, and it has been uniformly held that the statute conferring the jurisdiction and prescribing its exercise must be strictly construed. It will be observed, however, as we advance, that the question in the present case is not so much as to a grant of jurisdiction, as to how far a grant, originally full and complete, is affected by a subsequent limitation. The his-

tory of an act is properly consulted with a view to its just interpretation. Section one of the Justices Act confers jurisdiction on justices of the peace in a large number of enumerated cases, unconditionally, except in the matter of the amount claimed. This section was a part of an act, passed in 1861, at the first session of the legislature, and remained thus unqualified until the second session, when what is now section 103 was added by way of amendment. Subsequently both sections were embraced in the revision of 1868. Prior to the amendment, undoubtedly, both resident and non-resident debtors could have been impleaded wherever found. In the abuse of this power, or at least in its liability to abuse, the provisions of section 103 had their origin. Debtors were sued in tribunals distant from their places of residence, and the cost and vexation of litigation were thereby unnecessarily and oppressively increased. As a security against such abuses this section was adopted, giving resident debtors a *forum* at their own doors.

Such considerations, however, would not apply to the case of a non-resident debtor, unless the State should forego all jurisdiction of his person, and in all of its tribunals. The hardship with him was not in being sued in a justice's court, but in being sued in any court. When a resident debtor pleads the provisions of this section he *ousts* the jurisdiction of the particular justice, but may still be sued in the proper township. Could a non-resident debtor plead its provisions, he would not only *oust* the jurisdiction of the particular justice, but of any justice, and could not be sued at all in a justice's court, unless in the township of the plaintiff. This would be to give the non-resident debtor a preference over our own citizens, that we do not think the legislature intended. Both as a limitation on section one of this act, and as in derogation of the common law rule, that debts as such have no *locus* or *situs*, but accompany the creditor everywhere, and authorize a demand on the debtor everywhere, we think the section must be construed strictly. From these considerations, as well as from the language employed, we

think the section cannot be held to apply to non-resident debtors. It says: " Suits shall be commenced before justices in the township in which the debtor, or person sued, resides," etc. This describes a class of debtors, that is to say, *resident debtors*. To such only is the language used applicable, and such only can avail themselves of its provisions. Residence cannot be predicated of non-residents, and such are not only not included, but *ex vi termini*, are excluded, from the intention and meaning of the act. With respect to them, the jurisdiction stands as before the limitation was adopted, and they may be sued wherever found. Nor is this view regarded as in conflict with any thing said by the court in the case of *Melvin* v. *Latshaw*, 2 Col. 80, where the same section came under consideration.

It is sought to charge the defendant below upon an alleged promise to pay for goods before contracted for by one Heenan. As some stress is laid on the fact that the promise was made before the goods were shipped, it is well to say at the outset that all promises to answer for the debt or default of a third person must be in writing, whether the promise be made before, at the time, or after the debt or liability is created. *Maloney* v. *Gillett*, 21 N. Y. 412.

Standing alone and uncontrolled by circumstances showing a contrary intent, the words " we will see the articles paid for," or equivalent words, import a collateral undertaking, and are within the statute of frauds. Throop on Verbal Agreements, § 197 *et seq.; Watkins* v. *Perkins*, 1 Lord Raymond, 224 ; *Skinner* v. *Conant*, 2 Vermont, 453 ; *Twarts* v. *Crul*, 6 B. Monroe, 472 ; *Cahill* v. *Bigelow*, 18 Pick. 369.

Looking to the circumstances of the case for something that will authorize a different construction, we find that credit does not appear to have been given to any one. By the original contract between the plaintiffs and Heenan, no time of payment was fixed, and the presumption in such case is that payment and delivery were to be concurrent. Benjamin on Sales, § 677.

The object of the negotiations of defendants seems to have been not to obtain *credit* for Heenan or themselves, but to secure shipment of· the goods. Their promise, if original, was to pay for the goods on delivery, if collateral, · to answer for the default of Heenan should he not pay on delivery.

The goods were shipped to the agent of plaintiffs, and marked C. O. D. These initials have a well-known commercial meaning, and show clearly that the plaintiffs did not intend to give credit to any one. Their purpose is manifest to retain control of the goods and thereby secure themselves against the default of either Heenan or the defendants. Delivery to the carrier, therefore, was not delivery to the buyer, and the *jus disponendi* remained in the vendors. Benjamin on Sales, § 382 *et seq*.

We cannot say, therefore, that credit, in the ordinary acceptation of the term, was given to either Heenan or the defendants, and this inquiry, which is always resorted to as a means of determining the original or collateral character of the undertaking,, does not avail us. The book entry and bill were both in Heenan's name, and standing alone, *prima facie*, are an admission that the goods were furnished on Heenan's credit. 1 Greenleaf, § 196.

Considered, however, with reference to the foregoing facts, while they do not show a credit given, they tend strongly to show that Heenan was regarded by the plaintiffs, at the date of the shipment, as the original contracting party ; that the goods were shipped on *his order*, and not on a subsequent order of defendants ; and that the defendants had in no wise been substituted or considered as original promisors. In this respect, therefore, both book entry and bill confirm the collateral character of the undertaking by the defendants.

The fact that the defendants, one or both, were present with Heenan when Woodbury found the goods at the store, which Heenan was building, cannot be considered as of any weight in the present inquiry touching the collateral character of the promise. It was their duty, certainly their

right to be there, looking after their interests as owners. It cannot be said that owners under such circumstances must absent themselves, and forego the oversight of their interests, under penalty of being charged with the debts and on the contracts of their builders.

A circumstance of more importance is the fact that the defendants, when the bill was presented for payment, objected on other grounds than not being liable, and it is insisted that this is to be taken as an admission of their liability. Whatever may be the force of this circumstance in some aspects of the case, its bearing on the language of the promise made by the defendants is at best remote, and of necessity by a series of presumptions more or less forced, and all founded, not on what the defendants said, but on what they failed to say. We infer their liability from their failure to deny it. This is permissible under certain circumstances. 1 Greenleaf, § 197 *et seq.* But we go further, and infer that it was an admission of an original, and not a collateral liability; that it was an admission that they regarded their previous promise in the light of an original undertaking, notwithstanding the plain collateral import of its language. Such ground is too uncertain for either judge or jury to tread with safety. It would be to open the door to all the mischief sought to be avoided by the statute.

· The foregoing considerations equally apply, whether the plaintiffs proceed upon the theory that there was a delivery to the defendants, as original promisors, or a delivery to Heenan, upon the credit of the defendants.

They are also applicable in determining Heenan's liability, the rule being, that if the third person is liable at all the promisor's undertaking is collateral. Throop on Verb. Agr., §§ 147 and 178, and cases cited.

There was no controversy about the words of the promise, nor was there any circumstance but what strengthened their collateral import.

Whether under all the circumstances it should have been left to the jury to determine whether the promise was original or collateral, is a question upon which the court is not

agreed. The rule is that where the court can clearly ascertain from the testimony what the words were, the determination of their meaning, and the nature of the contract which they create, is to be made as a matter of law. Where the law assigns to the words a *prima facie* meaning *only*, and there is some evidence of their having been used in a different sense, then it is a question for the jury. Throop on Verb. Agr., § 183.

Clearly the jury should have been instructed as to the character of the words used as a matter of law, and the necessity of evidence to overcome their *prima facie* force. The rights of the defendants were under the protection of this rule, of which they did not receive the benefit, and which the court failed to explain or apply. In the absence of this the second instruction given for the plaintiffs was calculated to lead the jury to believe that the words used imported an original undertaking, and in the instructions given by the court upon its own motion, the phraseology of the promise is lost sight of, and they are framed as though there was an absolute promise to pay on the part of the defendants, in evidence. In this respect the instructions were erroneous.

It remains to consider another aspect of the case.

If there was a conversion, the plaintiff could. waive the tort and recover as in assumpsit. 1 Chitty's Pleadings, 107, (d), (1). 2 Greenleaf's Ev. 89, (5). But in this case, it would be incumbent on the plaintiffs to show a conversion by defendants.

There is no direct proof on this point, and how far the facts and circumstances of the case go to show the liability of the defendants, in this view, it is unnecessary to consider.

The controversy seems to have been over the character of the special promise, and of the many instructions given to the jury, but one went to the right of the plaintiffs to recover as in case of a conversion, and that but imperfectly In such case, the measure of damages would be the value of the goods at the place of delivery. If we were authorized to presume that the verdict of the jury was founded on

the conversion of the goods by the defendants, there was no evidence of their market value at Laramie City, the place of delivery. The instruction of the court, therefore, as to the measure of damages, was erroneous.

The judgment of the court below is reversed, with costs, and the case remanded for a new trial.

*Reversed.*