# BURNHAM *v.* SUPERIOR COURT OF CALIFORNIA, COUNTY OF MARIN (BURNHAM, REAL PARTY IN INTEREST)

No. 89–44.   Argued February 28, 1990—Decided May 29, 1990

SCALIA, J., announced the judgment of the Court and delivered an opin-
ion, in which REHNQUIST, C. J., and KENNEDY, J., joined, and in which

WHITE, J., joined as to Parts I, II–A, II–B, and II–C. WHITE, J., filed an opinion concurring in part and concurring in the judgment, *post*, p. 628. BRENNAN, J., filed an opinion concurring in the judgment, in which MARSHALL, BLACKMUN, and O'CONNOR, JJ., joined, *post*, p. 628. STEVENS, J., filed an opinion concurring in the judgment, *post*, p. 640.

*Richard Sherman* argued the cause for petitioner. With him on the briefs were *Victoria J. De Goff* and *Cecilia Lannon*.

*James O. Devereaux* argued the cause for respondent. With him on the brief was *Robert L. Nelson*.

JUSTICE SCALIA announced the judgment of the Court and delivered an opinion in which THE CHIEF JUSTICE and JUSTICE KENNEDY join, and in which JUSTICE WHITE joins with respect to Parts I, II–A, II–B, and II–C.

The question presented is whether the Due Process Clause of the Fourteenth Amendment denies California courts jurisdiction over a nonresident, who was personally served with process while temporarily in that State, in a suit unrelated to his activities in the State.

I

Petitioner Dennis Burnham married Francie Burnham in 1976 in West Virginia. In 1977 the couple moved to New Jersey, where their two children were born. In July 1987 the Burnhams decided to separate. They agreed that Mrs. Burnham, who intended to move to California, would take custody of the children. Shortly before Mrs. Burnham departed for California that same month, she and petitioner agreed that she would file for divorce on grounds of "irreconcilable differences."

In October 1987, petitioner filed for divorce in New Jersey state court on grounds of "desertion." Petitioner did not, however, obtain an issuance of summons against his wife and did not attempt to serve her with process. Mrs. Burnham, after unsuccessfully demanding that petitioner adhere to

their prior agreement to submit to an "irreconcilable differences" divorce, brought suit for divorce in California state court in early January 1988.

In late January, petitioner visited southern California on business, after which he went north to visit his children in the San Francisco Bay area, where his wife resided. He took the older child to San Francisco for the weekend. Upon returning the child to Mrs. Burnham's home on January 24, 1988, petitioner was served with a California court summons and a copy of Mrs. Burnham's divorce petition. He then returned to New Jersey.

Later that year, petitioner made a special appearance in the California Superior Court, moving to quash the service of process on the ground that the court lacked personal jurisdiction over him because his only contacts with California were a few short visits to the State for the purposes of conducting business and visiting his children. The Superior Court denied the motion, and the California Court of Appeal denied mandamus relief, rejecting petitioner's contention that the Due Process Clause prohibited California courts from asserting jurisdiction over him because he lacked "minimum contacts" with the State. The court held it to be "a valid jurisdictional predicate for *in personam* jurisdiction" that the "defendant [was] present in the forum state and personally served with process." App. to Pet. for Cert. 5. We granted certiorari. 493 U. S. 807 (1989).

## II

### A

The proposition that the judgment of a court lacking jurisdiction is void traces back to the English Year Books, see *Bowser* v. *Collins*, Y. B. Mich. 22 Edw. IV, f. 30, pl. 11, 145 Eng. Rep. 97 (Ex. Ch. 1482), and was made settled law by Lord Coke in *Case of the Marshalsea*, 10 Coke Rep. 68b, 77a, 77 Eng. Rep. 1027, 1041 (K. B. 1612). Traditionally that proposition was embodied in the phrase *coram non judice,*

"before a person not a judge"—meaning, in effect, that the proceeding in question was not a *judicial* proceeding because lawful judicial authority was not present, and could therefore not yield a *judgment*. American courts invalidated, or denied recognition to, judgments that violated this common-law principle long before the Fourteenth Amendment was adopted. See, *e. g.*, *Grumon* v. *Raymond*, 1 Conn. 40 (1814); *Picquet* v. *Swan*, 19 F. Cas. 609 (No. 11,134) (CC Mass. 1828); *Dunn* v. *Dunn*, 4 Paige 425 (N. Y. Ch. 1834); *Evans* v. *Instine*, 7 Ohio 273 (1835); *Steel* v. *Smith*, 7 Watts & Serg. 447 (Pa. 1844); *Boswell's Lessee* v. *Otis*, 9 How. 336, 350 (1850). In *Pennoyer* v. *Neff*, 95 U. S. 714, 732 (1878), we announced that the judgment of a court lacking personal jurisdiction violated the Due Process Clause of the Fourteenth Amendment as well.

To determine whether the assertion of personal jurisdiction is consistent with due process, we have long relied on the principles traditionally followed by American courts in marking out the territorial limits of each State's authority. That criterion was first announced in *Pennoyer* v. *Neff, supra*, in which we stated that due process "mean[s] a course of legal proceedings according to those rules and principles which have been established in our systems of jurisprudence for the protection and enforcement of private rights," *id.*, at 733, including the "well-established principles of public law respecting the jurisdiction of an independent State over persons and property," *id.*, at 722. In what has become the classic expression of the criterion, we said in *International Shoe Co.* v. *Washington*, 326 U. S. 310 (1945), that a state court's assertion of personal jurisdiction satisfies the Due Process Clause if it does not violate " 'traditional notions of fair play and substantial justice.' " *Id.*, at 316, quoting *Milliken* v. *Meyer*, 311 U. S. 457, 463 (1940). See also *Insurance Corp. of Ireland* v. *Compagnie des Bauxites de Guinee*, 456 U. S. 694, 703 (1982). Since *International Shoe*, we have only been called upon to decide whether these "traditional notions" per-

mit States to exercise jurisdiction over absent defendants in a manner that deviates from the rules of jurisdiction applied in the 19th century. We have held such deviations permissible, but only with respect to suits arising out of the absent defendant's contacts with the State.[1] See, *e. g.*, *Helicopteros Nacionales de Colombia* v. *Hall*, 466 U. S. 408, 414 (1984). The question we must decide today is whether due process requires a similar connection between the litigation and the defendant's contacts with the State in cases where the defendant is physically present in the State at the time process is served upon him.

## B

Among the most firmly established principles of personal jurisdiction in American tradition is that the courts of a State have jurisdiction over nonresidents who are physically present in the State. The view developed early that each State had the power to hale before its courts any individual who could be found within its borders, and that once having acquired jurisdiction over such a person by properly serving him with process, the State could retain jurisdiction to enter

---

[1] We have said that "[e]ven when the cause of action does not arise out of or relate to the foreign corporation's activities in the forum State, due process is not offended by a State's subjecting the corporation to its *in personam* jurisdiction when there are sufficient contacts between the State and the foreign corporation." *Helicopteros Nacionales de Colombia* v. *Hall*, 466 U. S., at 414. Our only holding supporting that statement, however, involved "regular service of summons upon [the corporation's] president while he was in [the forum State] acting in that capacity." See *Perkins* v. *Benguet Consolidated Mining Co.*, 342 U. S. 437, 440 (1952). It may be that whatever special rule exists permitting "continuous and systematic" contacts, *id.*, at 438, to support jurisdiction with respect to matters unrelated to activity in the forum applies *only* to corporations, which have never fitted comfortably in a jurisdictional regime based primarily upon "de facto power over the defendant's person." *International Shoe Co.* v. *Washington*, 326 U. S. 310, 316 (1945). We express no views on these matters—and, for simplicity's sake, omit reference to this aspect of "contacts"-based jurisdiction in our discussion.

judgment against him, no matter how fleeting his visit. See, *e. g.*, *Potter* v. *Allin*, 2 Root 63, 67 (Conn. 1793); *Barrell* v. *Benjamin*, 15 Mass. 354 (1819). That view had antecedents in English common-law practice, which sometimes allowed "transitory" actions, arising out of events outside the country, to be maintained against seemingly nonresident defendants who were present in England. See, *e. g.*, *Mostyn* v. *Fabrigas*, 98 Eng. Rep. 1021 (K. B. 1774); *Cartwright* v. *Pettus*, 22 Eng. Rep. 916 (Ch. 1675). Justice Story believed the principle, which he traced to Roman origins, to be firmly grounded in English tradition: "[B]y the common law[,] personal actions, being transitory, may be brought in any place, where the party defendant may be found," for "every nation may . . . rightfully exercise jurisdiction over all persons within its domains." J. Story, Commentaries on the Conflict of Laws §§ 554, 543 (1846). See also *id.*, §§ 530–538; *Picquet* v. *Swan, supra*, at 611–612 (Story, J.) ("Where a party is within a territory, he may justly be subjected to its process, and bound personally by the judgment pronounced, on such process, against him").

Recent scholarship has suggested that English tradition was not as clear as Story thought, see Hazard, A General Theory of State-Court Jurisdiction, 1965 S. Ct. Rev. 241, 253–260; Ehrenzweig, The Transient Rule of Personal Jurisdiction: The "Power" Myth and Forum Conveniens, 65 Yale L. J. 289 (1956). Accurate or not, however, judging by the evidence of contemporaneous or near-contemporaneous decisions, one must conclude that Story's understanding was shared by American courts at the crucial time for present purposes: 1868, when the Fourteenth Amendment was adopted. The following passage in a decision of the Supreme Court of Georgia, in an action on a debt having no apparent relation to the defendant's temporary presence in the State, is representative:

> "Can a citizen of Alabama be sued in this State, as he passes through it?

"Undoubtedly he can. The second of the axioms of *Huberus*, as translated by *Story*, is: 'that all persons who are found within the limits of a government, whether their residence is permanent or temporary, are to be deemed subjects thereof.' *(Stor. Conf. Laws, §29, Note 3.)*

". . . [A] citizen of another State, who is merely passing through this, resides, as he passes, wherever he is. Let him be sued, therefore, wherever he may, he will be sued where he resides.

"The plaintiff in error, although a citizen of Alabama, was passing through the County of Troup, in this State, and whilst doing so, he was sued in Troup. He was liable to be sued in this State, and in Troup County of this State." *Murphy* v. *J. S. Winter & Co.*, 18 Ga. 690, 691–692 (1855).

See also, *e. g.*, *Peabody* v. *Hamilton*, 106 Mass. 217, 220 (1870) (relying on Story for the same principle); *Alley* v. *Caspari*, 80 Me. 234, 236–237, 14 A. 12, 13 (1888) (same).

Decisions in the courts of many States in the 19th and early 20th centuries held that personal service upon a physically present defendant sufficed to confer jurisdiction, without regard to whether the defendant was only briefly in the State or whether the cause of action was related to his activities there. See, *e. g.*, *Vinal* v. *Core*, 18 W. Va. 1, 20 (1881); *Roberts* v. *Dunsmuir*, 75 Cal. 203, 204, 16 P. 782 (1888); *De Poret* v. *Gusman*, 30 La. Ann., pt. 2, pp. 930, 932 (1878); *Smith* v. *Gibson*, 83 Ala. 284, 285, 3 So. 321 (1887); *Savin* v. *Bond*, 57 Md. 228, 233 (1881); *Hart* v. *Granger*, 1 Conn. 154, 165 (1814); *Mussina* v. *Belden*, 6 Abb. Pr. 165, 176 (N. Y. Sup. Ct. 1858); *Darrah* v. *Watson*, 36 Iowa 116, 120–121 (1872); *Baisley* v. *Baisley*, 113 Mo. 544, 549–550, 21 S. W. 29, 30 (1893); *Bowman* v. *Flint*, 37 Tex. Civ. App. 28, 29, 82 S. W. 1049, 1050 (1904). See also *Reed* v. *Hollister*, 106 Ore. 407, 412–414, 212 P. 367, 369–370 (1923); *Hagen* v. *Viney*, 124 Fla. 747, 751, 169 So. 391, 392–393 (1936); *Vaughn*

v. *Love*, 324 Pa. 276, 280, 188 A. 299, 302 (1936).[2]  Although research has not revealed a case deciding the issue in every State's courts, that appears to be because the issue was so well settled that it went unlitigated.  See R. Leflar, American Conflicts Law § 24, p. 43 (1968) ("The law is so clear on this point that there are few decisions on it"); Note, Developments in the Law—State Court Jurisdiction, 73 Harv. L. Rev. 909, 937–938 (1960).  Opinions from the courts of other States announced the rule in dictum.  See, *e. g.*, *Reed* v. *Browning*, 130 Ind. 575, 577, 30 N. E. 704, 705 (1892); *Nathanson* v. *Spitz*, 19 R. I. 70, 72, 31 A. 690, 691 (1895); *McLeod* v. *Connecticut & Passumpsic River R. Co.*, 58 Vt. 727, 733–734, 6 A. 648, 649, 650 (1886); *New Orleans J. & G. N. R. Co.* v. *Wallace*, 50 Miss. 244, 248–249 (1874); *Wagner* v. *Hallack*, 3 Colo. 176, 182–183 (1877); *Downer* v. *Shaw*, 22 N. H. 277, 281 (1851); *Moore* v. *Smith*, 41 Ky. 340, 341 (1842); *Adair County Bank* v. *Forrey*, 74 Neb. 811, 815, 105 N. W. 714, 715–716 (1905).  Most States, moreover, had statutes or common-law rules that exempted from service of process individuals who were brought into the forum by force or fraud, see, *e. g.*, *Wanzer* v. *Bright*, 52 Ill. 35 (1869), or who were there as a party or witness in unrelated judicial proceedings, see, *e. g.*, *Burroughs* v. *Cocke & Willis*, 56 Okla. 627, 156 P. 196 (1916); *Malloy* v. *Brewer*, 7 S. D. 587, 64 N. W. 1120 (1895).  These exceptions obviously rested upon the premise that service of process conferred jurisdiction.  See *Anderson* v. *Atkins*, 161 Tenn. 137, 140, 29 S. W. 2d 248, 249 (1930).  Particularly striking is the fact that, as far as we have been able to determine, *not one* American case from the period (or, for that matter, not one American case

---

[2] JUSTICE BRENNAN's assertion that some of these cases involved dicta rather than holdings, *post*, at 636–637, n. 10, is incorrect.  In each case, personal service within the State was the exclusive basis for the judgment that jurisdiction existed, and no other factor was relied upon.  Nor is it relevant for present purposes that these holdings might instead have been rested on other available grounds.

614

until 1978) held, or even suggested, that in-state personal service on an individual was insufficient to confer personal jurisdiction.[3]   Commentators were also seemingly unanimous

---

[3] Given this striking fact, and the unanimity of both cases and commentators in supporting the in-state service rule, one can only marvel at JUSTICE BRENNAN's assertion that the rule "was rather weakly implanted in American jurisprudence," *post*, at 633–634, and "did not receive wide currency until well after our decision in *Pennoyer* v. *Neff*," *post*, at 635.    I have cited pre-*Pennoyer* cases clearly supporting the rule from no less than nine States, ranging from Mississippi to Colorado to New Hampshire, and two highly respected pre-*Pennoyer* commentators.   (It is, moreover, impossible to believe that the many other cases decided shortly after *Pennoyer* represented some sort of instant mutation—or, for that matter, that *Pennoyer* itself was not drawing upon clear contemporary understanding.) JUSTICE BRENNAN cites neither cases nor commentators from the relevant period to support his thesis (with exceptions I shall discuss presently), and instead relies upon modern secondary sources that do not mention, and were perhaps unaware of, many of the materials I have discussed.   The cases cited by JUSTICE BRENNAN, *post*, at 634–635, n. 9, do not remotely support his point.   The dictum he quotes from *Coleman's Appeal*, 75 Pa. 441, 458 (1874), to the effect that "a man shall only be liable to be called on to answer for civil wrongs in the forum of his home, and the tribunal of his vicinage," was addressing the situation where no personal service in the State had been obtained.   This is clear from the court's earlier statements that "there is no mode of reaching by any process issuing from a court of common law, the person of a non-resident defendant not found within the jurisdiction," *id.*, at 456, and "[u]pon a summons, unless there is service within the jurisdiction, there can be no judgment for want of appearance against the defendant." *Ibid.   Gardner* v. *Thomas*, 14 Johns. *134 (N. Y. 1817), and *Molony* v. *Dows*, 8 Abb. Pr. 316 (N. Y. Common Pleas 1859), are irrelevant to the present discussion.   *Gardner*, in which the court declined to adjudicate a tort action between two British subjects for a tort that occurred on the high seas aboard a British vessel, specifically affirmed that jurisdiction did exist, but said that its exercise "must, on principles of policy, often rest in the sound discretion of the Court."   *Gardner* v. *Thomas*, *supra*, at *137–*138.   The decision is plainly based, in modern terms, upon the doctrine of *forum non conveniens.   Molony* did indeed hold that in-state service could not support the adjudication of an action for physical assault by one Californian against another in California (acknowledging that this appeared to contradict an earlier New York case), but it rested that holding upon a doctrine akin to the principle that no State will

on the rule. See, *e. g.*, 1 A. Freeman, Law of Judgments 470–471 (1873); 1 H. Black, Law of Judgments 276–277 (1891); W. Alderson, Law of Judicial Writs and Process 225–226 (1895). See also Restatement of Conflict of Laws §§ 77–78 (1934).

This American jurisdictional practice is, moreover, not merely old; it is continuing. It remains the practice of, not only a substantial number of the States, but as far as we are aware *all* the States and the Federal Government—if one disregards (as one must for this purpose) the few opinions since 1978 that have erroneously said, on grounds similar to those that petitioner presses here, that this Court's due process decisions render the practice unconstitutional. See *Nehemiah* v. *Athletics Congress of U. S. A.*, 765 F. 2d 42, 46–47 (CA3 1985); *Schreiber* v. *Allis-Chalmers Corp.*, 448 F. Supp. 1079, 1088–1091 (Kan. 1978), rev'd on other grounds, 611 F. 2d 790 (CA10 1979); *Harold M. Pitman Co.* v. *Typecraft Software Ltd.*, 626 F. Supp. 305, 310–314 (ND Ill. 1986); *Bershaw* v. *Sarbacher*, 40 Wash. App. 653, 657, 700 P. 2d 347, 349 (1985); *Duehring* v. *Vasquez*, 490 So. 2d 667, 671 (La. App. 1986). We do not know of a single state or federal statute, or a single judicial decision resting upon state law, that has abandoned in-state service as a basis of jurisdiction. Many recent cases reaffirm it. See *Hutto* v. *Plagens*, 254 Ga. 512,

---

enforce the penal laws of another—that is, resting upon the injury to the public peace of the other State that such an assault entails, and upon the fact that the damages awarded include penal elements. *Molony* v. *Dows, supra*, at 330. The fairness or propriety of exercising jurisidiction over the parties had nothing to do with the decision, as is evident from the court's acknowledgment that if the Californians were suing one another over a contract dispute jurisdiction would lie, no matter where the contract arose. 8 Abb. Pr., at 328. As for JUSTICE BRENNAN's citation of the 1880 commentator John Cleland Wells, *post*, at 635, n. 9, it suffices to quote what is set forth on the very page cited: "It is held to be a principle of the common law that any non-resident defendant voluntarily coming within the jurisdiction may be served with process, and compelled to answer." 1 J. Wells, Jurisdiction of Courts 76 (1880).

513, 330 S. E. 2d 341, 342 (1985); *Oxmans' Erwin Meat Co.* v. *Blacketer*, 86 Wis. 2d 683, 273 N. W. 2d 285 (1979); *Lockert* v. *Breedlove*, 321 N. C. 66, 361 S. E. 2d 581 (1987); *Nutri-West* v. *Gibson*, 764 P. 2d 693 (Wyo. 1988); *Klavan* v. *Klavan*, 405 Mass. 1105, 1106, 544 N. E. 2d 863, 864 (1989); *Nielsen* v. *Braland*, 264 Minn. 481, 483, 484, 119 N. W. 2d 737, 738 (1963); *Read* v. *Sonat Offshore Drilling, Inc.*, 515 So. 2d 1229, 1230 (Miss. 1987); *Cariaga* v. *Eighth Judicial District Court*, 104 Nev. 544, 762 P. 2d 886 (1988); *El-Maksoud* v. *El-Maksoud*, 237 N. J. Super. 483, 486–490, 568 A. 2d 140, 142–144 (1989); *Carr* v. *Carr*, 180 W. Va. 12–14, 375 S. E. 2d 190, 192 (1988); *O'Brien* v. *Eubanks*, 701 P. 2d 614, 616 (Colo. App. 1985); *Wolfson* v. *Wolfson*, 455 So. 2d 577, 578 (Fla. App. 1984); *In re Marriage of Pridemore*, 146 Ill. App. 3d 990, 991–992, 497 N. E. 2d 818, 819–820 (1986); *Swarts* v. *Dean*, 13 Kan. App. 2d 228, 766 P. 2d 1291, 1292 (1989).

## C

Despite this formidable body of precedent, petitioner contends, in reliance on our decisions applying the *International Shoe* standard, that in the absence of "continuous and systematic" contacts with the forum, see n. 1, *supra*, a nonresident defendant can be subjected to judgment only as to matters that arise out of or relate to his contacts with the forum. This argument rests on a thorough misunderstanding of our cases.

The view of most courts in the 19th century was that a court simply could not exercise *in personam* jurisdiction over a nonresident who had not been personally served with process in the forum. See, *e. g.*, *Reber* v. *Wright*, 68 Pa. 471, 476–477 (1871); *Sturgis* v. *Fay*, 16 Ind. 429, 431 (1861); *Weil* v. *Lowenthal*, 10 Iowa 575, 578 (1860); Freeman, Law of Judgments, *supra*, at 468–470; see also *D'Arcy* v. *Ketchum*, 11 How. 165, 176 (1851); *Knowles* v. *Gaslight & Coke Co.*, 19 Wall. 58, 61 (1874). *Pennoyer* v. *Neff*, while renowned for its statement of the principle that the Fourteenth Amend-

ment prohibits such an exercise of jurisdiction, in fact set that forth only as dictum and decided the case (which involved a judgment rendered more than two years before the Fourteenth Amendment's ratification) under "well-established principles of public law." 95 U. S., at 722. Those principles, embodied in the Due Process Clause, required (we said) that when proceedings "involv[e] merely a determination of the personal liability of the defendant, he must be brought within [the court's] jurisdiction by service of process within the State, or his voluntary appearance." *Id.*, at 733. We invoked that rule in a series of subsequent cases, as either a matter of due process or a "fundamental princi-pl[e] of jurisprudence," *Wilson* v. *Seligman*, 144 U. S. 41, 46 (1892). See, *e. g.*, *New York Life Ins. Co.* v. *Dunlevy*, 241 U. S. 518, 522–523 (1916); *Goldey* v. *Morning News*, 156 U. S. 518, 521 (1895).

Later years, however, saw the weakening of the *Pennoyer* rule. In the late 19th and early 20th centuries, changes in the technology of transportation and communication, and the tremendous growth of interstate business activity, led to an "inevitable relaxation of the strict limits on state jurisdiction" over nonresident individuals and corporations. *Hanson* v. *Denckla*, 357 U. S. 235, 260 (1958) (Black, J., dissenting). States required, for example, that nonresident corporations appoint an in-state agent upon whom process could be served as a condition of transacting business within their borders, see, *e. g.*, *St. Clair* v. *Cox*, 106 U. S. 350 (1882), and provided in-state "substituted service" for nonresident motorists who caused injury in the State and left before personal service could be accomplished, see, *e. g.*, *Kane* v. *New Jersey*, 242 U. S. 160 (1916); *Hess* v. *Pawloski*, 274 U. S. 352 (1927). We initially upheld these laws under the Due Process Clause on grounds that they complied with *Pennoyer*'s rigid requirement of either "consent," see, *e. g.*, *Hess* v. *Pawloski, supra*, at 356, or "presence," see, *e. g.*, *Philadelphia & Reading R. Co.* v. *McKibbin*, 243 U. S. 264, 265 (1917). As many ob-

served, however, the consent and presence were purely fictional. See, *e. g.*, 1 J. Beale, Conflict of Laws 360, 384 (1935); *Hutchinson* v. *Chase & Gilbert, Inc.*, 45 F. 2d 139, 141 (CA2 1930) (L. Hand, J.). Our opinion in *International Shoe* cast those fictions aside and made explicit the underlying basis of these decisions: Due process does not necessarily *require* the States to adhere to the unbending territorial limits on jurisdiction set forth in *Pennoyer*. The validity of assertion of jurisdiction over a nonconsenting defendant who is not present in the forum depends upon whether "the quality and nature of [his] activity" in relation to the forum, 326 U. S., at 319, renders such jurisdiction consistent with "'traditional notions of fair play and substantial justice.'" *Id.*, at 316 (citation omitted). Subsequent cases have derived from the *International Shoe* standard the general rule that a State may dispense with in-forum personal service on nonresident defendants in suits arising out of their activities in the State. See generally *Helicopteros Nacionales de Colombia* v. *Hall*, 466 U. S., at 414–415. As *International Shoe* suggests, the defendant's litigation-related "minimum contacts" may take the place of physical presence as the basis for jurisdiction:

> "Historically the jurisdiction of courts to render judgment *in personam* is grounded on their de facto power over the defendant's person. Hence his presence within the territorial jurisdiction of a court was prerequisite to its rendition of a judgment personally binding on him. *Pennoyer* v. *Neff*, 95 U. S. 714, 733. But now that the *capias ad respondendum* has given way to personal service of summons or other form of notice, due process requires only that in order to subject a defendant to a judgment *in personam*, if he be not present within the territory of the forum, he have certain minimum contacts with it such that the maintenance of the suit does not offend 'traditional notions of fair play and substantial justice.'" 326 U. S., at 316 (citations omitted).

Nothing in *International Shoe* or the cases that have followed it, however, offers support for the very different proposition petitioner seeks to establish today: that a defendant's presence in the forum is not only unnecessary to validate novel, nontraditional assertions of jurisdiction, but is itself no longer sufficient to establish jurisdiction. That proposition is unfaithful to both elementary logic and the foundations of our due process jurisprudence. The distinction between what is needed to support novel procedures and what is needed to sustain traditional ones is fundamental, as we observed over a century ago:

> "[A] process of law, which is not otherwise forbidden, must be taken to be due process of law, if it can show the sanction of settled usage both in England and in this country; but it by no means follows that nothing else can be due process of law. . . . [That which], in substance, has been immemorially the actual law of the land . . . therefor[e] is due process of law. But to hold that such a characteristic is essential to due process of law, would be to deny every quality of the law but its age, and to render it incapable of progress or improvement. It would be to stamp upon our jurisprudence the unchangeableness attributed to the laws of the Medes and Persians." *Hurtado* v. *California,* 110 U. S. 516, 528–529 (1884).

The short of the matter is that jurisdiction based on physical presence alone constitutes due process because it is one of the continuing traditions of our legal system that define the due process standard of "traditional notions of fair play and substantial justice." That standard was developed by *analogy* to "physical presence," and it would be perverse to say it could now be turned against that touchstone of jurisdiction.

## D

Petitioner's strongest argument, though we ultimately reject it, relies upon our decision in *Shaffer* v. *Heitner,* 433

U. S. 186 (1977). In that case, a Delaware court hearing a shareholder's derivative suit against a corporation's directors secured jurisdiction *quasi in rem* by sequestering the out-of-state defendants' stock in the company, the situs of which was Delaware under Delaware law. Reasoning that Delaware's sequestration procedure was simply a mechanism to compel the absent defendants to appear in a suit to determine their personal rights and obligations, we concluded that the normal rules we had developed under *International Shoe* for jurisdiction over suits against absent defendants should apply — viz., Delaware could not hear the suit because the defendants' sole contact with the State (ownership of property there) was unrelated to the lawsuit. 433 U. S., at 213–215.

It goes too far to say, as petitioner contends, that *Shaffer* compels the conclusion that a State lacks jurisdiction over an individual unless the litigation arises out of his activities in the State. *Shaffer*, like *International Shoe*, involved jurisdiction over an *absent defendant*, and it stands for nothing more than the proposition that when the "minimum contact" that is a substitute for physical presence consists of property ownership it must, like other minimum contacts, be related to the litigation. Petitioner wrenches out of its context our statement in *Shaffer* that "all assertions of state-court jurisdiction must be evaluated according to the standards set forth in *International Shoe* and its progeny," 433 U. S., at 212. When read together with the two sentences that preceded it, the meaning of this statement becomes clear:

> "The fiction that an assertion of jurisdiction over property is anything but an assertion of jurisdiction over the owner of the property supports an ancient form without substantial modern justification. Its continued acceptance would serve only to allow state-court jurisdiction that is fundamentally unfair to the defendant.
>
> "We *therefore conclude* that all assertions of state-court jurisdiction must be evaluated according to the

standards set forth in *International Shoe* and its progeny." *Ibid.* (emphasis added).

*Shaffer* was saying, in other words, not that all bases for the assertion of *in personam* jurisdiction (including, presumably, in-state service) must be treated alike and subjected to the "minimum contacts" analysis of *International Shoe;* but rather that *quasi in rem* jurisdiction, that fictional "ancient form," and *in personam* jurisdiction, are really one and the same and must be treated alike—leading to the conclusion that *quasi in rem* jurisdiction, *i. e.*, that form of *in personam* jurisdiction based upon a "property ownership" contact and by definition unaccompanied by personal, in-state service, must satisfy the litigation-relatedness requirement of *International Shoe.* The logic of *Shaffer's* holding—which places all suits against absent nonresidents on the same constitutional footing, regardless of whether a separate Latin label is attached to one particular basis of contact—does not compel the conclusion that physically present defendants must be treated identically to absent ones. As we have demonstrated at length, our tradition has treated the two classes of defendants quite differently, and it is unreasonable to read *Shaffer* as casually obliterating that distinction. *International Shoe* confined its "minimum contacts" requirement to situations in which the defendant "be not present within the territory of the forum," 326 U. S., at 316, and nothing in *Shaffer* expands that requirement beyond that.

It is fair to say, however, that while our holding today does not contradict *Shaffer*, our basic approach to the due process question is different. We have conducted no independent inquiry into the desirability or fairness of the prevailing in-state service rule, leaving that judgment to the legislatures that are free to amend it; for our purposes, its validation is its pedigree, as the phrase *"traditional notions* of fair play and substantial justice" makes clear. *Shaffer* did conduct such an independent inquiry, asserting that "'traditional notions of fair play and substantial justice' can be as readily offended

by the perpetuation of ancient forms that are no longer justified as by the adoption of new procedures that are inconsistent with the basic values of our constitutional heritage." 433 U. S., at 212. Perhaps that assertion can be sustained when the "perpetuation of ancient forms" is engaged in by only a very small minority of the States.[4] Where, however, as in the present case, a jurisdictional principle is both firmly approved by tradition and still favored, it is impossible to imagine what standard we could appeal to for the judgment that it is "no longer justified." While in no way receding from or casting doubt upon the holding of *Shaffer* or any other case, we reaffirm today our time-honored approach, see, *e. g., Ownbey* v. *Morgan,* 256 U. S. 94, 110–112 (1921); *Hurtado* v. *California,* 110 U. S., at 528–529; *Murray's Lessee* v. *Hoboken Land & Improvement Co.,* 59 U. S. 272, 276–277 (1856). For new procedures, hitherto unknown, the Due Process clause requires analysis to determine whether "traditional notions of fair play and substantial justice" have been offended. *International Shoe,* 326 U. S., at 316. But a doctrine of personal jurisdiction that dates back to the adoption of the Fourteenth Amendment and is still generally observed unquestionably meets that standard.

### III

A few words in response to JUSTICE BRENNAN's opinion concurring in the judgment: It insists that we apply "contemporary notions of due process" to determine the constitutionality of California's assertion of jurisdiction. *Post,* at 632. But our analysis today comports with that prescription, at least if we give it the only sense allowed by our precedents. The "contemporary notions of due process" applicable to per-

---

[4] *Shaffer* may have involved a unique state procedure in one respect: JUSTICE STEVENS noted that Delaware was the only State that treated the place of incorporation as the situs of corporate stock when both owner and custodian were elsewhere. See 433 U. S., at 218 (opinion concurring in judgment).

sonal jurisdiction are the enduring *"traditional* notions of fair play and substantial justice" established as the test by *International Shoe.* By its very language, that test is satisfied if a state court adheres to jurisdictional rules that are generally applied and have always been applied in the United States.

But the concurrence's proposed standard of "contemporary notions of due process" requires more: It measures state-court jurisdiction not only against traditional doctrines in this country, including current state-court practice, but also against each Justice's subjective assessment of what is fair and just. Authority for that seductive standard is not to be found in any of our personal jurisdiction cases. It is, indeed, an outright break with the test of "traditional notions of fair play and substantial justice," which would have to be reformulated *"our* notions of fair play and substantial justice."

The subjectivity, and hence inadequacy, of this approach becomes apparent when the concurrence tries to explain *why* the assertion of jurisdiction in the present case meets its standard of continuing-American-tradition-*plus*-innate-fairness. JUSTICE BRENNAN lists the "benefits" Mr. Burnham derived from the State of California—the fact that, during the few days he was there, "[h]is health and safety [were] guaranteed by the State's police, fire, and emergency medical services; he [was] free to travel on the State's roads and waterways; he likely enjoy[ed] the fruits of the State's economy." *Post,* at 637–638. Three days' worth of these benefits strike us as powerfully inadequate to establish, as an abstract matter, that it is "fair" for California to decree the ownership of all Mr. Burnham's worldly goods acquired during the 10 years of his marriage, and the custody over his children. We daresay a contractual exchange swapping those benefits for that power would not survive the "unconscionability" provision of the Uniform Commercial Code. Even less persuasive are the other "fairness" factors alluded to by JUSTICE BRENNAN. It would create "an asymmetry," we are told, if Burnham were *permitted* (as he is) to appear

in California courts as a plaintiff, but were not *compelled* to appear in California courts as defendant; and travel being as easy as it is nowadays, and modern procedural devices being so convenient, it is no great hardship to appear in California courts. *Post*, at 638–639. The problem with these assertions is that they justify the exercise of jurisdiction over *everyone, whether or not* he ever comes to California. The only "fairness" elements setting Mr. Burnham apart from the rest of the world are the three days' "benefits" referred to above—and even those, do not set him apart from many other people who have enjoyed three days in the Golden State (savoring the fruits of its economy, the availability of its roads and police services) but who were fortunate enough not to be served with process while they were there and thus are not (simply by reason of that savoring) subject to the general jurisdiction of California's courts. See, *e. g.*, *Helicopteros Nacionales de Colombia* v. *Hall*, 466 U. S., at 414–416. In other words, even if one agreed with JUSTICE BRENNAN's conception of an equitable bargain, the "benefits" we have been discussing would explain why it is "fair" to assert general jurisdiction over Burnham-returned-to-New-Jersey-after-service only at the expense of proving that it is also "fair" to assert general jurisdiction over Burnham-returned-to-New-Jersey-*without*-service—which we *know* does not conform with "contemporary notions of due process."

There is, we must acknowledge, one factor mentioned by JUSTICE BRENNAN that *both* relates distinctively to the assertion of jurisdiction on the basis of personal in-state service *and* is fully persuasive—namely, the fact that a defendant voluntarily present in a particular State has a "reasonable expectatio[n]" that he is subject to suit there. *Post*, at 637. By formulating it as a "reasonable expectation" JUSTICE BRENNAN makes that seem like a "fairness" factor; but in reality, of course, it is just tradition masquerading as "fairness." The only reason for charging Mr. Burnham with the reasonable expectation of being subject to suit is that the

States of the Union assert adjudicatory jurisdiction over the person, and have always asserted adjudicatory jurisdiction over the person, by serving him with process during his temporary physical presence in their territory. That continuing tradition, which anyone entering California should have known about, renders it "fair" for Mr. Burnham, who voluntarily entered California, to be sued there for divorce—at least "fair" in the limited sense that he has no one but himself to blame. JUSTICE BRENNAN's long journey is a circular one, leaving him, at the end of the day, in complete reliance upon the very factor he sought to avoid: The existence of a continuing tradition is not enough, fairness also must be considered; fairness exists here because there is a continuing tradition.

While JUSTICE BRENNAN's concurrence is unwilling to confess that the Justices of this Court can possibly be bound by a continuing American tradition that a particular procedure is fair, neither is it willing to embrace the logical consequences of that refusal—or even to be clear about what consequences (logical or otherwise) it does embrace. JUSTICE BRENNAN says that "[f]or these reasons [*i. e.*, because of the reasonableness factors enumerated above], as a rule the exercise of personal jurisdiction over a defendant based on his voluntary presence in the forum will satisfy the requirements of due process." *Post*, at 639. The use of the word "rule" conveys the reassuring feeling that he is establishing a principle of law one can rely upon—but of course he is not. Since JUSTICE BRENNAN's only criterion of constitutionality is "fairness," the phrase "as a rule" represents nothing more than his estimation that, *usually*, all the elements of "fairness" he discusses in the present case will exist. But what if they do not? Suppose, for example, that a defendant in Mr. Burnham's situation enjoys not three days' worth of California's "benefits," but 15 minutes' worth. Or suppose we remove one of those "benefits"—"enjoy[ment of] the fruits of the State's economy"—by positing that Mr. Burnham had not

come to California on business, but only to visit his children. Or suppose that Mr. Burnham were demonstrably so impecunious as to be unable to take advantage of the modern means of transportation and communication that JUSTICE BRENNAN finds so relevant. Or suppose, finally, that the California courts lacked the "variety of procedural devices," *post*, at 639, that JUSTICE BRENNAN says can reduce the burden upon out-of-state litigants. One may also make additional suppositions, relating not to the absence of the factors that JUSTICE BRENNAN discusses, but to the presence of additional factors bearing upon the ultimate criterion of "fairness." What if, for example, Mr. Burnham were visiting a sick child? Or a dying child? Cf. *Kulko* v. *Superior Court of California, City and County of San Francisco*, 436 U. S. 84, 93 (1978) (finding the exercise of long-arm jurisdiction over an absent parent unreasonable because it would "discourage parents from entering into reasonable visitation agreements"). Since, so far as one can tell, JUSTICE BRENNAN's approval of applying the in-state service rule in the present case rests on the presence of *all* the factors he lists, and on the absence of any others, every different case will present a different litigable issue. Thus, despite the fact that he manages to work the word "rule" into his formulation, JUSTICE BRENNAN's approach does not establish a rule of law at all, but only a "totality of the circumstances" test, guaranteeing what traditional territorial rules of jurisdiction were designed precisely to avoid: uncertainty and litigation over the preliminary issue of the forum's competence. It may be that those evils, necessarily accompanying a freestanding "reasonableness" inquiry, must be accepted at the margins, when we evaluate *non*traditional forms of jurisdiction newly adopted by the States, see, *e. g., Asahi Metal Industry Co.* v. *Superior Court of California, Solano County*, 480 U. S. 102, 115 (1987). But that is no reason for injecting them into the core of our American practice, exposing to such a "reasonableness" inquiry the ground of jurisdiction that has hith-

erto been considered the very *baseline* of reasonableness, physical presence.

The difference between us and JUSTICE BRENNAN has nothing to do with whether "further progress [is] to be made" in the "evolution of our legal system." *Post*, at 631, n. 3. It has to do with whether changes are to be adopted as progressive by the American people or decreed as progressive by the Justices of this Court. Nothing we say today prevents individual States from limiting or entirely abandoning the in-state-service basis of jurisdiction. And nothing prevents an overwhelming majority of them from doing so, with the consequence that the "traditional notions of fairness" that this Court applies may change. But the States have overwhelmingly declined to adopt such limitation or abandonment, evidently not considering it to be progress.[5] The question is whether, armed with no authority other than individual Justices' perceptions of fairness that conflict with both past and current practice, this Court can compel the States to make such a change on the ground that "due process" requries it. We hold that it cannot.

\*   \*   \*

---

[5] I find quite unacceptable as a basis for this Court's decisions JUSTICE BRENNAN's view that "the *raison d'être* of various constitutional doctrines designed to protect out-of-staters, such as the Art. IV Privileges and Immunities Clause and the Commerce Clause," *post*, at 640, n. 14, entitles this Court to brand as "unfair," and hence unconstitutional, the refusal of all 50 States "to limit or abandon bases of jurisdiction that have become obsolete," *post*, at 639, n. 14. "Due process" (which is the constitutional text at issue here) does not mean that process which shifting majorities of this Court feel to be "due"; but that process which American society—self-interested American society, which expresses its judgments in the laws of self-interested States—has traditionally considered "due." The notion that the Constitution, through some penumbra emanating from the Privileges and Immunities Clause and the Commerce Clause, establishes this Court as a Platonic check upon the society's greedy adherence to its traditions can only be described as imperious.

Because the Due Process Clause does not prohibit the California courts from exercising jurisdiction over petitioner based on the fact of in-state service of process, the judgment is

*Affirmed.*

JUSTICE WHITE, concurring in part and concurring in the judgment.

I join Parts I, II–A, II–B, and II–C of JUSTICE SCALIA's opinion and concur in the judgment of affirmance. The rule allowing jurisdiction to be obtained over a nonresident by personal service in the forum State, without more, has been and is so widely accepted throughout this country that I could not possibly strike it down, either on its face or as applied in this case, on the ground that it denies due process of law guaranteed by the Fourteenth Amendment. Although the Court has the authority under the Amendment to examine even traditionally accepted procedures and declare them invalid, *e. g., Shaffer* v. *Heitner,* 433 U. S. 186 (1977), there has been no showing here or elsewhere that as a general proposition the rule is so arbitrary and lacking in common sense in so many instances that it should be held violative of due process in every case. Furthermore, until such a showing is made, which would be difficult indeed, claims in individual cases that the rule would operate unfairly as applied to the particular nonresident involved need not be entertained. At least this would be the case where presence in the forum State is intentional, which would almost always be the fact. Otherwise, there would be endless, fact-specific litigation in the trial and appellate courts, including this one. Here, personal service in California, without more, is enough, and I agree that the judgment should be affirmed.

JUSTICE BRENNAN, with whom JUSTICE MARSHALL, JUSTICE BLACKMUN, and JUSTICE O'CONNOR join, concurring in the judgment.

I agree with JUSTICE SCALIA that the Due Process Clause of the Fourteenth Amendment generally permits a state

court to exercise jurisdiction over a defendant if he is served with process while voluntarily present in the forum State.[1] I do not perceive the need, however, to decide that a jurisdictional rule that "'has been immemorially the actual law of the land,'" *ante*, at 619, quoting *Hurtado* v. *California*, 110 U. S. 516, 528 (1884), automatically comports with due process simply by virtue of its "pedigree." Although I agree that history is an important factor in establishing whether a jurisdictional rule satisfies due process requirements, I cannot agree that it is the *only* factor such that all traditional rules of jurisdiction are, *ipso facto*, forever constitutional. Unlike JUSTICE SCALIA, I would undertake an "independent inquiry into the . . . fairness of the prevailing in-state service rule." *Ante*, at 621. I therefore concur only in the judgment.

## I

I believe that the approach adopted by JUSTICE SCALIA's opinion today—reliance solely on historical pedigree—is foreclosed by our decisions in *International Shoe Co.* v. *Washington*, 326 U. S. 310 (1945), and *Shaffer* v. *Heitner*, 433 U. S. 186 (1977). In *International Shoe*, we held that a state court's assertion of personal jurisdiction does not violate the Due Process Clause if it is consistent with "'traditional notions of fair play and substantial justice.'" 326 U. S., at 316, quoting *Milliken* v. *Meyer*, 311 U. S. 457, 463 (1940).[2] In *Shaffer*, we stated that *"all* assertions of statecourt jurisdiction must be evaluated according to the standards set forth in *International Shoe* and its progeny." 433

---

[1] I use the term "transient jurisdiction" to refer to jurisdiction premised solely on the fact that a person is served with process while physically present in the forum State.

[2] Our reference in *International Shoe* to "'traditional notions of fair play and substantial justice,'" 326 U. S., at 316, meant simply that those concepts are indeed traditional ones, not that, as JUSTICE SCALIA's opinion suggests, see *ante*, at 621, 622, their specific *content* was to be determined by tradition alone. We recognized that contemporary societal norms must play a role in our analysis. See, *e. g.*, 326 U. S., at 317 (considerations of "reasonable[ness], in the context of our federal system of government").

U. S., at 212 (emphasis added). The critical insight of *Shaffer* is that all rules of jurisdiction, even ancient ones, must satisfy contemporary notions of due process. No longer were we content to limit our jurisdictional analysis to pronouncements that "[t]he foundation of jurisdiction is physical power," *McDonald* v. *Mabee*, 243 U. S. 90, 91 (1917), and that "every State possesses exclusive jurisdiction and sovereignty over persons and property within its territory." *Pennoyer* v. *Neff*, 95 U. S. 714, 722 (1878). While acknowledging that "history must be considered as supporting the proposition that jurisdiction based solely on the presence of property satisfie[d] the demands of due process," we found that this factor could not be "decisive." 433 U. S., at 211–212. We recognized that "'[t]raditional notions of fair play and substantial justice' can be as readily offended by the perpetuation of ancient forms that are no longer justified as by the adoption of new procedures that are inconsistent with the basic values of our constitutional heritage." *Id.*, at 212 (citations omitted). I agree with this approach and continue to believe that "the minimum-contacts analysis developed in *International Shoe* . . . represents a far more sensible construct for the exercise of state-court jurisdiction than the patchwork of legal and factual fictions that has been generated from the decision in *Pennoyer* v. *Neff*." *Id.*, at 219 (BRENNAN, J., concurring in part and dissenting in part) (citation omitted).

While our *holding* in *Shaffer* may have been limited to *quasi in rem* jurisdiction, our mode of analysis was not. Indeed, that we were willing in *Shaffer* to examine anew the appropriateness of the *quasi in rem* rule—until that time dutifully accepted by American courts for at least a century—demonstrates that we did not believe that the "pedigree" of a jurisdictional practice was dispositive in deciding whether it was consistent with due process. We later characterized *Shaffer* as "abandon[ing] the outworn rule of *Harris* v. *Balk*, 198 U. S. 215 (1905), that the interest of a creditor in a debt

could be extinguished or otherwise affected by any State having transitory jurisdiction over the debtor." *World-Wide Volkswagen Corp.* v. *Woodson*, 444 U. S. 286, 296 (1980); see also *Rush* v. *Savchuk*, 444 U. S. 320, 325–326 (1980). If we could discard an "ancient form without substantial modern justification" in *Shaffer, supra*, at 212, we can do so again.[3] Lower courts,[4] commentators,[5] and the American Law In-

[3] Even JUSTICE SCALIA's opinion concedes that *sometimes* courts may discard "traditional" rules when they no longer comport with contemporary notions of due process. For example, although, beginning with the Romans, judicial tribunals for over a millenium permitted jurisdiction to be acquired by force, see L. Wenger, Institutes of the Roman Law of Civil Procedure 46–47 (O. Fisk trans., rev. ed. 1986), by the 19th century, as JUSTICE SCALIA acknowledges, this method had largely disappeared. See *ante*, at 613. I do not see why JUSTICE SCALIA's opinion assumes that there is no further progress to be made and that the evolution of our legal system, and the society in which it operates, ended 100 years ago.

[4] Some lower courts have concluded that transient jurisdiction did not survive *Shaffer*. See *Nehemiah* v. *Athletics Congress of U. S. A.*, 765 F. 2d 42, 46–47 (CA3 1985); *Schreiber* v. *Allis-Chalmers Corp.*, 448 F. Supp. 1079, 1088–1091 (Kan. 1978), rev'd on other grounds, 611 F. 2d 790 (CA10 1979); *Harold M. Pitman Co.* v. *Typecraft Software Ltd.*, 626 F. Supp. 305, 310–314 (ND Ill. 1986); *Bershaw* v. *Sarbacher*, 40 Wash. App. 653, 657, 700 P. 2d 347, 349 (1985). Others have held that transient jurisdiction is alive and well. See *ante*, at 615–616. But even cases falling into the latter category have engaged in the type of due process analysis that JUSTICE SCALIA's opinion claims is unnecessary today. See, *e. g., Amusement Equipment, Inc.* v. *Mordelt*, 779 F. 2d 264, 270 (CA5 1985); *Hutto* v. *Plagens*, 254 Ga. 512, 513, 330 S. E. 2d 341, 342 (1985); *In re Marriage of Pridemore*, 146 Ill. App. 3d 990, 992, 497 N. E. 2d 818, 819–820 (1986); *Oxmans' Erwin Meat Co.* v. *Blacketer*, 86 Wis. 2d 683, 688–692, 273 N. W. 2d 285, 287–290 (1979); *Lockert* v. *Breedlove*, 321 N. C. 66, 71–72, 361 S. E. 2d 581, 585 (1987); *Nutri-West* v. *Gibson*, 764 P. 2d 693, 695–696 (Wyo. 1988); *Cariaga* v. *Eighth Judicial District Court*, 104 Nev. 544, 547, 762 P. 2d 886, 888 (1988); *El-Maksoud* v. *El-Maksoud*, 237 N. J. Super. 483, 489, 568 A. 2d 140, 143 (1989); *Carr* v. *Carr*, 180 W. Va. 12, 14, and n. 5, 375 S. E. 2d 190, 192, and n. 5 (1988).

[5] Although commentators have disagreed over whether the rule of transient jurisdiction is consistent with modern conceptions of due process, that they have engaged in such a debate at all shows that they have rejected the methodology employed by JUSTICE SCALIA's opinion today. See

stitute[6] all have interpreted *International Shoe* and *Shaffer* to mean that *every* assertion of state-court jurisdiction, even one pursuant to a "traditional" rule such as transient jurisdiction, must comport with contemporary notions of due process. Notwithstanding the nimble gymnastics of JUS-

Bernstine, *Shaffer* v. *Heitner:* A Death Warrant for the Transient Rule of In Personam Jurisdiction?, 25 Vill. L. Rev. 38, 47–68 (1979–1980); Brilmayer et al., A General Look at General Jurisdiction, 66 Texas L. Rev. 721, 748–755 (1988); Fyr, Shaffer v. Heitner: The Supreme Court's Latest Last Words on State Court Jurisdiction, 26 Emory L. J. 739, 770–773 (1977); Lacy, Personal Jurisdiction and Service of Summons After *Shaffer* v. *Heitner*, 57 Ore. L. Rev. 505, 510 (1978); Posnak, A Uniform Approach to Judicial Jurisdiction After *Worldwide* and the Abolition of the "Gotcha" Theory, 30 Emory L. J. 729, 735, n. 30 (1981); Redish, Due Process, Federalism, and Personal Jurisdiction: A Theoretical Evaluation, 75 Nw. U. L. Rev. 1112, 1117, n. 35 (1981); Sedler, Judicial Jurisdiction and Choice of Law: The Consequences of *Shaffer* v. *Heitner*, 63 Iowa L. Rev. 1031, 1035 (1978); Silberman, *Shaffer* v. *Heitner:* The End of an Era, 53 N. Y. U. L. Rev. 33, 75 (1978); Vernon, Single Factor Bases of In Personam Jurisdiction—A Speculation on the Impact of *Shaffer* v. *Heitner*, 1978 Wash. U. L. Q. 273, 303; Von Mehren, Adjudicatory Jurisdiction: General Theories Compared and Evaluated, 63 B. U. L. Rev. 279, 300–307 (1983); Zammit, Reflections on *Shaffer* v. *Heitner*, 5 Hastings Const. L. Q. 15, 24 (1978).

[6] See Restatement (Second) of Conflict of Laws § 24, Comment *b*, p. 29 (Draft of Proposed Revisions, Apr. 15, 1986) ("One basic principle underlies all rules of jurisdiction. This principle is that a state does not have jurisdiction in the absence of some reasonable basis for exercising it. With respect to judicial jurisdiction, this principle was laid down by the Supreme Court of the United States in International Shoe . . . ."); *id.*, at 30 ("Three factors are primarily responsible for existing rules of judicial jurisdiction. Present-day notions of fair play and substantial justice constitute the first factor"); *id.*, § 28, Comment *b*, at 41, ("The Supreme Court held in Shaffer v. Heitner that the presence of a thing in a state gives that state jurisdiction to determine interests in the thing only in situations where the exercise of such jurisdiction would be reasonable. . . . It must likewise follow that considerations of reasonableness qualify the power of a state to exercise personal jurisdiction over an individual on the basis of his physical presence within its territory"); Restatement (Second) of Judgments § 8, Comment *a*, p. 64 (Tent. Draft No. 5, Mar. 10, 1978) (*Shaffer* establishes " 'minimum contacts' in place of presence as the principal basis for territorial jurisdiction").

TICE SCALIA's opinion today, it is not faithful to our decision in *Shaffer*.

## II

Tradition, though alone not dispositive, is of course *relevant* to the question whether the rule of transient jurisdiction is consistent with due process.[7] Tradition is salient not in the sense that practices of the past are automatically reasonable today; indeed, under such a standard, the legitimacy of transient jurisdiction would be called into question because the rule's historical "pedigree" is a matter of intense debate. The rule was a stranger to the common law[8] and was rather

---

[7] I do not propose that the "contemporary notions of due process" to be applied are no more than "each Justice's subjective assessment of what is fair and just." *Ante*, at 623. Rather, the inquiry is guided by our decisions beginning with *International Shoe Co.* v. *Washington*, 326 U. S. 310 (1945), and the specific factors that we have developed to ascertain whether a jurisdictional rule comports with "traditional notions of fair play and substantial justice." See, *e. g.*, *Asahi Metal Industry Co.* v. *Superior Court of California, Solano County*, 480 U. S. 102, 113 (1987) (noting "several factors," including "the burden on the defendant, the interests of the forum State, and the plaintiff's interest in obtaining relief"). This analysis may not be "mechanical or quantitative," *International Shoe, supra*, at 319, but neither is it "freestanding," *ante*, at 626, or dependent on personal whim. Our experience with this approach demonstrates that it is well within our competence to employ.

[8] As JUSTICE SCALIA's opinion acknowledges, American courts in the 19th century erected the theory of transient jurisdiction largely upon Justice Story's historical interpretation of Roman and continental sources. JUSTICE SCALIA's opinion concedes that the rule's tradition "was not as clear as Story thought," *ante*, at 611; in fact, it now appears that as a historical matter Story was almost surely wrong. See Ehrenzweig, The Transient Rule of Personal Jurisdiction: The "Power" Myth and Forum Conveniens, 65 Yale L. J. 289, 293–303 (1956); Hazard, A General Theory of State-Court Jurisdiction, 1965 S. Ct. Rev. 241, 261 ("Story's system reflected neither decided authority nor critical analysis"). Undeniably, Story's views are in considerable tension with English common law—a "tradition" closer to our own and thus, I would imagine, one that in JUSTICE SCALIA's eyes is more deserving of our study than civil law practice. See R. Boote, An Historical Treatise of an Action or Suit at Law 97 (3d ed. 1805); G. Cheshire, Private International Law 601 (4th ed. 1952); J. West-

weakly implanted in American jurisprudence "at the cru-
cial time for present purposes: 1868, when the Fourteenth
Amendment was adopted." *Ante,* at 611. For much of the
19th century, American courts did not uniformly recognize
the concept of transient jurisdiction,[9] and it appears that the

---

lake, Private International Law 101–102 (1859); Note, British Precedents
for Due Process Limitations on In Personam Jurisdiction, 48 Colum. L.
Rev. 605, 610–611 (1948) ("The [British] cases evidence a judicial intent to
limit the rules to those instances where their application is consonant with
the demands of 'fair play' and 'substantial justice' ").

It seems that Justice Story's interpretation of historical practice amounts
to little more than what Justice Story himself perceived to be "fair and
just." See *ante,* at 611 (quoting Justice Story's statement that " '[w]here a
party is within a territory, he may *justly* be subjected to its process' ") (em-
phasis added and citation omitted). I see no reason to bind ourselves for-
ever to that perception.

[9] In *Molony* v. *Dows,* 8 Abb. Pr. 316 (N. Y. Common Pleas 1859), for
example, the court dismissed an action for a tort that had occurred in Cali-
fornia, even though the defendant was served with process while he was in
the forum State of New York. The court rejected the plaintiff's conten-
tion that it possessed "jurisdiction of all actions, local and transitory, where
the defendant resides, or is personally served with process," *id.,* at 325,
with the comment that "an action cannot be maintained in this court, or in
any court of this State, to recover a pecuniary satisfaction in damages for a
wilful injury to the person, inflicted in another State, where, at the time of
the act, both the wrongdoer and the party injured were domiciled in that
State as resident citizens." *Id.,* at 326. The court reasoned that it could
not "undertake to redress every wrong that may have happened in any
part of the world, [merely] because the parties, plaintiff or defendant, may
afterwards happen to be within [the court's] jurisdiction." *Id.,* at 327–328.
Similarly, the Pennsylvania Supreme Court declared it "the *most impor-
tant* principle of *all* municipal law of Anglo-Saxon origin, that a man shall
only be liable to be called upon to answer for civil wrongs in the forum of
his home, and the tribunal of his vicinage." *Coleman's Appeal,* 75 Pa. 441,
458 (1874) (emphasis added). And in *Gardner* v. *Thomas,* 14 Johns. *134
(N. Y. 1817), the court was faced with the question "whether this Court
will take cognizance of a tort committed on the high seas, on board of a
foreign vessel, both the parties being subjects or citizens of the country to
which the vessel belongs," after the ship had docked in New York and suit
was commenced there. The court observed that Lord Mansfield had ap-
peared "to doubt whether an action may be maintained in *England* for an

transient rule did not receive wide currency until well after our decision in *Pennoyer* v. *Neff*, 95 U. S. 714 (1878).[10]

Rather, I find the historical background relevant because, however murky the jurisprudential origins of transient juris-

---

injury in consequence of two persons fighting in *France*, [even] when both are within the jurisdiction of the Court." *Id.*, at *137. The court distinguished the instant case as an action "for an injury on the high seas"—a location, "of course, without the actual or exclusive territory of any nation." *Ibid.* Nevertheless, the court found that while "our Courts may take cognizance of torts committed on the high seas, on board of a foreign vessel where both parties are foreigners, . . . it must, on principles of policy, often rest in the sound discretion of the Court to afford jurisdiction or not, according to the circumstances of the case." *Id.*, at *137–*138. In the particular case before it, the court found jurisdiction lacking. See *id.*, at *138. See also 1 J. Wells, Jurisdiction of Courts 76 (1880) (reporting that a state court had argued that "courts have jurisdiction of actions for torts as to property, even where the parties are non-resident, and the torts were committed out of the state, if the defendant is served with process within the state," but also noting that "*Clerke*, J., very vigorously dissented in the case, and, I judge, with good reason").

It is possible to distinguish these cases narrowly on their facts, as JUSTICE SCALIA demonstrates. See *ante*, at 614–615, n. 3. Thus, *Molony* could be characterized as a case about the reluctance of one State to punish assaults occurring in another, *Gardner* as a *forum non conveniens* case, and *Coleman's Appeal* as a case in which there was no in-state service of process. But such an approach would mistake the trees for the forest. The truth is that the transient rule as we now conceive it had no clear counterpart at common law. Just as today there is an interaction among rules governing jurisdiction, *forum non conveniens*, and choice of law, see, *e. g.*, *Ferens* v. *John Deere Co.*, 494 U. S. 516, 530–531 (1990); *Shaffer*, 433 U. S. 186, 224–226 (1977) (BRENNAN, J., concurring in part and dissenting in part); *Hanson* v. *Denckla*, 357 U. S. 235, 256 (1958) (Black, J., dissenting), at common law there was a complex interplay among pleading requirements, venue, and substantive law—an interplay which in large part substituted for a theory of "jurisdiction":

"A theory of territorial jurisdiction would in any event have been premature in England before, say, 1688, or perhaps even 1832. Problems of jurisdiction were the essence of medieval English law and remained significant until the period of Victorian reform. But until after 1800 it would have been impossible, even if it had been thought appropriate, to

diction, the fact that American courts have announced the
rule for perhaps a century (first in dicta, more recently in
holdings) provides a defendant voluntarily present in a par-
ticular State *today* "clear notice that [he] is subject to suit" in

disentangle the question of territorial limitations on jurisdiction from those
arising out of charter, prerogative, personal privilege, corporate liberty,
ancient custom, and the fortuities of rules of pleading, venue, and process.
The intricacies of English jurisdictional law of that time resist generaliza-
tion on any theory except a franchisal one; they seem certainly not reduc-
ible to territorial dimension.

"The English precedents on jurisdiction were therefore of little rele-
vance to American problems of the nineteenth century." Hazard, A Gen-
eral Theory of State-Court Jurisdiction, 1965 S. Ct. Rev. 241, 252–253
(footnote omitted).

See also Twitchell, The Myth of General Jurisdiction, 101 Harv. L. Rev.
610, 617 (1988). The salient point is that many American courts followed
English precedents and restricted the place where certain actions could be
brought, regardless of the defendant's presence or whether he was served
there.

ⁱ⁰ One distinguished legal historian has observed that "notwithstanding
dogmatic generalizations later sanctioned by the *Restatement* [of Conflict
of Laws], appellate courts hardly ever in fact held transient service suffi-
cient as such" and that "although the transient rule has often been mouthed
by the courts, it has but rarely been applied." Ehrenzweig, 65 Yale L. J.,
at 292, 295 (footnote omitted). Many of the cases cited in JUSTICE
SCALIA's opinion, see *ante*, at 612–613, involve either announcement of the
rule in dictum or situations where factors other than in-state service sup-
ported the exercise of jurisdiction. See, *e. g.*, *Alley* v. *Caspari*, 80
Me. 234, 236, 14 A. 12 (1888) (defendant found to be resident of forum);
*De Poret* v. *Gusman*, 30 La. Ann., pt. 2, 930, 932 (1878) (cause of action
arose in forum); *Savin* v. *Bond*, 57 Md. 228, 233 (1881) (both defendants
residents of forum State); *Hart* v. *Granger*, 1 Conn. 154, 154–155 (1814) (suit
brought against former resident of forum State based on contract entered
into there); *Baisley* v. *Baisley*, 113 Mo. 544, 550, 21 S. W. 29, 30 (1893)
(court ruled for plaintiff on grounds of estoppel because defendant had failed
to raise timely objection to jurisdiction in a prior suit); *Bowman* v. *Flint*, 37
Tex. Civ. App. 28, 28–29, 82 S. W. 1049, 1049–1050 (1904) (defendant did
business within forum State, and cause of action arose there as well). In
*Picquet* v. *Swan*, 19 F. Cas. 609 (No. 11,134) (CC Mass. 1828), Justice
Story found jurisdiction to be *lacking* over a suit by a French citizen (a
resident of Paris) against an American citizen also residing in Paris. See

the forum. *World-Wide Volkswagen Corp.* v. *Woodson*, 444 U. S., at 297. Regardless of whether Justice Story's account of the rule's genesis is mythical, our common understanding *now*, fortified by a century of judicial practice, is that jurisdiction is often a function of geography. The transient rule is consistent with reasonable expectations and is entitled to a strong presumption that it comports with due process. "If I visit another State, . . . I knowingly assume some risk that the State will exercise its power over my property or my person while there. My contact with the State, though minimal, gives rise to predictable risks." *Shaffer*, 433 U. S., at 218 (STEVENS, J., concurring in judgment); see also *Burger King Corp.* v. *Rudzewicz*, 471 U. S. 462, 476 (1985) ("[T]erritorial presence frequently will enhance a potential defendant's affiliation with a State and reinforce the reasonable foreseeability of suit there"); Glen, An Analysis of "Mere Presence" and Other Traditional Bases of Jurisdiction, 45 Brooklyn L. Rev. 607, 611–612 (1979). Thus, proposed revisions to the Restatement (Second) of Conflict of Laws § 28, p. 39 (1986), provide that "[a] state has power to exercise judicial jurisdiction over an individual who is present within its territory unless the individual's relationship to the state is so attenuated as to make the exercise of such jurisdiction unreasonable." [11]

By visiting the forum State, a transient defendant actually "avail[s]" himself, *Burger King, supra,* at 476, of significant benefits provided by the State. His health and safety are guaranteed by the State's police, fire, and emergency medical services; he is free to travel on the State's roads and water-

---

also Hazard, *supra,* at 261 (criticizing Story's reasoning in *Picquet* as "at variance" with both American and English decisions).

[11] As the Restatement suggests, there may be cases in which a defendant's involuntary or unknowing presence in a State does not support the exercise of personal jurisdiction over him. The facts of the instant case do not require us to determine the outer limits of the transient jurisdiction rule.

ways; he likely enjoys the fruits of the State's economy as well. Moreover, the Privileges and Immunities Clause of Article IV prevents a state government from discriminating against a transient defendant by denying him the protections of its law or the right of access to its courts.[12]   See *Supreme Court of New Hampshire* v. *Piper*, 470 U. S. 274, 281, n. 10 (1985); *Baldwin* v. *Montana Fish and Game Comm'n*, 436 U. S. 371, 387 (1978); see also *Supreme Court of Virginia* v. *Friedman*, 487 U. S. 59, 64–65 (1988).   Subject only to the doctrine of *forum non conveniens*, an out-of-state plaintiff may use state courts in all circumstances in which those courts would be available to state citizens.   Without transient jurisdiction, an asymmetry would arise: A transient would have the full benefit of the power of the forum State's courts as a plaintiff while retaining immunity from their authority as a defendant.   See Maltz, Sovereign Authority, Fairness, and Personal Jurisdiction: The Case for the Doctrine of Transient Jurisdiction, 66 Wash. U. L. Q. 671, 698–699 (1988).

The potential burdens on a transient defendant are slight. "'[M]odern transportation and communications have made it much less burdensome for a party sued to defend himself'" in a State outside his place of residence.   *Burger King, supra,* at 474, quoting *McGee* v. *International Life Ins. Co.*, 355 U. S. 220, 223 (1957).   That the defendant has already jour-

---

[12] That these privileges may independently be required by the Constitution does not mean that they must be ignored for purposes of determining the fairness of the transient jurisdiction rule.   For example, in the context of specific jurisdiction, we consider whether a defendant "has availed himself of the privilege of conducting business" in the forum State, *Burger King Corp.* v. *Rudzewicz*, 471 U. S. 462, 476 (1985), or has "'invok[ed] the benefits and protections of its laws,'" *id.*, at 475, quoting *Hanson* v. *Denckla*, 357 U. S., at 253, even though the State could not deny the defendant the right to do so.   See also *Asahi Metal Industry Co.* v. *Superior Court of California, Solano County*, 480 U. S., at 108–109 (plurality opinion); *Keeton* v. *Hustler Magazine, Inc.*, 465 U. S. 770, 781 (1984); *World-Wide Volkswagen Corp.* v. *Woodson*, 444 U. S. 286, 297 (1980).

neyed at least once before to the forum—as evidenced by the fact that he was served with process there—is an indication that suit in the forum likely would not be prohibitively inconvenient. Finally, any burdens that do arise can be ameliorated by a variety of procedural devices.[13] For these reasons, as a rule the exercise of personal jurisdiction over a defendant based on his voluntary presence in the forum will satisfy the requirements of due process.[14] See n. 11, *supra.*

---

[13] For example, in the federal system, a transient defendant can avoid protracted litigation of a spurious suit through a motion to dismiss for failure to state a claim or through a motion for summary judgment. Fed. Rules Civ. Proc. 12(b)(6) and 56. He can use relatively inexpensive methods of discovery, such as oral deposition by telephone (Rule 30(b)(7)), deposition upon written questions (Rule 31), interrogatories (Rule 33), and requests for admission (Rule 36), while enjoying protection from harassment (Rule 26(c)), and possibly obtaining costs and attorney's fees for some of the work involved (Rules 37(a)(4), (b)–(d)). Moreover, a change of venue may be possible. 28 U. S. C. § 1404. In state court, many of the same procedural protections are available, as is the doctrine of *forum non conveniens*, under which the suit may be dismissed. See generally Abrams, Power, Convenience, and the Elimination of Personal Jurisdiction in the Federal Courts, 58 Ind. L. J. 1, 23–25 (1982).

[14] JUSTICE SCALIA's opinion maintains that, viewing transient jurisdiction as a contractual bargain, the rule is "unconscionabl[e]," *ante,* at 623, according to contemporary conceptions of fairness. But the opinion simultaneously insists that because of its historical "pedigree," the rule is "the very *baseline* of reasonableness." *Ante,* at 627. Thus is revealed JUSTICE SCALIA's belief that tradition *alone* is completely dispositive and that no showing of unfairness can ever serve to invalidate a traditional jurisdictional practice. I disagree both with this belief and with JUSTICE SCALIA's assessment of the fairness of the transient jurisdiction bargain.

I note, moreover, that the dual conclusions of JUSTICE SCALIA's opinion create a singularly unattractive result. JUSTICE SCALIA suggests that when and if a jurisdictional rule becomes substantively unfair or even "unconscionable," this Court is powerless to alter it. Instead, he is willing to rely on individual States to limit or abandon bases of jurisdiction that have become obsolete. See *ante,* at 627, and n. 5. This reliance is misplaced, for States have little incentive to limit rules such as transient jurisdiction that make it *easier* for their own citizens to sue out-of-state defendants. That States are more likely to expand their jurisdiction is illustrated by the

In this case, it is undisputed that petitioner was served with process while voluntarily and knowingly in the State of California.    I therefore concur in the judgment.

JUSTICE STEVENS, concurring in the judgment.

As I explained in my separate writing, I did not join the Court's opinion in *Shaffer* v. *Heitner*, 433 U. S. 186 (1977), because I was concerned by its unnecessarily broad reach. *Id.*, at 217–219 (opinion concurring in judgment).    The same concern prevents me from joining either JUSTICE SCALIA's or JUSTICE BRENNAN's opinion in this case.    For me, it is sufficient to note that the historical evidence and consensus identified by JUSTICE SCALIA, the considerations of fairness identified by JUSTICE BRENNAN, and the common sense displayed by JUSTICE WHITE, all combine to demonstrate that this is, indeed, a very easy case.*    Accordingly, I agree that the judgment should be affirmed.

---

adoption by many States of long-arm statutes extending the reach of personal jurisdiction to the limits established by the Federal Constitution. See 2 J. Moore, J. Lucas, H. Fink, & C. Thompson, Moore's Federal Practice ¶ 4.41–1[4], p. 4–336 (2d ed. 1989); 4 C. Wright & A. Miller, Federal Practice and Procedure § 1068, pp. 336–339 (1987).    Out-of-staters do not vote in state elections or have a voice in state government.    We should not assume, therefore, that States will be motivated by "notions of fairness" to curb jurisdictional rules like the one at issue here.    The reasoning of JUSTICE SCALIA's opinion today is strikingly oblivious to the *raison d'être* of various constitutional doctrines designed to protect out-of-staters, such as the Art. IV Privileges and Immunities Clause and the Commerce Clause.

*Perhaps the adage about hard cases making bad law should be revised to cover easy cases.